# EXHIBIT 4

**DRAFT**
5/28/2025

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| K.MIZRA LLC, | Civil Action No.: 1:25-cv-00236-ADA |
| Plaintiff, | |
| v. | Jury Trial Demanded |
| GOOGLE LLC, | |
| Defendant. | |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff K.Mizra LLC ("K.Mizra") files this First Amended Complaint for patent infringement against Defendant Google LLC ("Google"), alleging as follows:

**TABLE OF CONTENTS**

INDEX OF EXHIBITS .................................................................................................. iii

I.   **INTRODUCTION** ............................................................................................. 1

     A.   **The Asserted Zero Trust Network Security Patent** ........................... 1

     B.   **The Asserted Hyperparameter Tuning Patent** ................................. 3

     C.   **The Asserted Mesh Networking Patent** ............................................ 3

     D.   **K.Mizra's Licensing Model** ................................................................. 4

II.  **THE PARTIES** ................................................................................................ 4

III. **JURISDICTION AND VENUE** ..................................................................... 5

IV.  **GENERAL ALLEGATIONS** ......................................................................... 5

     A.   **The Zero Trust Network Security Patent and Google's Infringement** ........... 5

          1.   **Prior Licensing and Litigation Concerning
               the Asserted Zero Trust Network Security Patent** ...................... 6

          2.   **Computer Network Security Problems In 2004 Solved
               by the Asserted Zero Trust Network Security Patents** ............. 6

          3.   **K.Mizra's Asserted Zero Trust Network
               Security Patent Claims Are Presumed Valid** ............................. 8

          4.   **Failed IPRs Brought Against the
               Asserted Zero Trust Network Security Patents** ...................... 13

          5.   **Google's Infringing Chrome Enterprise Premium Product** .......... 14

     B.   **The Asserted Hyperparameter Tuning Patent** ............................... 17

          1.   **Prior Licensing and Litigation Concerning
               the Hyperparameter Tuning Patent** ........................................ 17

          2.   **Problems in 2007 Solved By the
               Asserted Hyperparameter Tuning Patent** ............................... 18

          3.   **K.Mizra's Asserted Hyperparameter
               Tuning Patent Claims Are Presumed Valid** ............................ 22

          4.   **Google's Infringing Vertex AI Studio Product** ...................... 23

i

**C.**     **The Asserted Mesh Networking Patent** ................................................... 24

    **1.**     **Prior Licensing and Litigation Concerning
the Mesh Networking Patent** ............................................... 24

    **2.**     **Problems in 2007 Solved By the
Mesh Networking Patent** ..................................................... 25

    **3.**     **K.Mizra's Asserted Mesh Networking
Patent Claims Are Presumed Valid** .................................... 26

    **4.**     **Google's Infringing Nest Devices** ................................... 27

**V.**     **FIRST CLAIM FOR RELIEF
(Patent Infringement Under 35 U.S.C. § 271 of the '705 Patent)** ............................. 32

**VI.**    **SECOND CLAIM FOR RELIEF
(Patent Infringement Under 35 U.S.C. § 271 of the '120 Patent)** ............................. 50

**VII.**   **THIRD CLAIM FOR RELIEF
(Patent Infringement Under 35 U.S.C. § 271 of the '717 Patent)** ............................. 58

**VIII.**  **REQUEST FOR RELIEF** ................................................................. 70

**IX.**    **DEMAND FOR JURY TRIAL** ........................................................... 71

**INDEX OF EXHIBITS**

| Ex | Description |
|---|---|
| 1 | U.S. Patent No. 8,234,705 |
| 2 | U.S. Patent No. 8,234,705 – Preliminary Infringement Contention Claim Chart |
| 3 | Next '24_ Introducing Chrome Enterprise Premium, the future of endpoint security _ Google Cloud Blog |
| 4 | Chrome Enterprise Premium access protection overview _ BeyondCorp Enterprise _ Google Cloud |
| 5 | BeyondCorp Zero Trust Enterprise Security _ Google Cloud |
| 6 | U.S. Patent No. 8,438,120 |
| 7 | U.S. Patent No. 8,144,717 |
| 8 | Thread Play Services APIs Matter Google Home Developers |
| 9 | Connect Thread smart devices with Google TV Streamer (4K) - Android - Google TV Help |
| 10 | Nest Connect - Range Extender for Detect & Guard - Google Store |
| 11 | Nest debuts Nest Secure home system and has a Thread router called Nest Connect - Stacey on IoT _ Internet of Things news and analysis |
| 12 | Nest × Yale Lock - Key-Free Smart Deadbolt - Google Store _1 |
| 13 | Pixel 9 series arrives at the FCC, includes Thread |
| 14 | Chrome Enterprise Premium documentation |
| 15 | Endpoint Verification Overview |
| 16 | Chrome Enterprise Premium Overview |
| 17 | How to prevent account takeovers with new certificate-based access |
| 18 | Understand Mutual TLS at Google Cloud |
| 19 | Deploy Endpoint Verification to use with certificate-based access |
| 20 | New Google API Will Securely Verify Chrome Devices |
| 21 | Chrome Verified Access |
| 22 | Context Aware Access insights and recommendations are now generally available |
| 23 | Block compromised mobile devices using context-aware access |
| 24 | Allow users to unblock apps with remediation messages in Context Aware Access |
| 25 | Vertex AI Platform Google Cloud |
| 26 | Vertex AI custom training overview Google Cloud |
| 27 | Vertex AI documentation  Google Cloud |
| 28 | Overview of hyperparameter tuning Vertex AI Google Cloud |
| 29 | Create a hyperparameter tuning job for python package Vertex AI  Google Cloud |
| 30 | Intro to Model Tuning: Grid and Random Search (excerpts) |
| 31 | Comparing Randomized Search and Grid Search for Hyperparameter Estimation in Scikit Learn GeeksforGeeks |
| 32 | OpenThread Homepage |
| 33 | Nest Hub Smart Displays for your Home - Google Store |
| 34 | Developing with OpenThread APIs |
| 35 | Network Discovery and Formation OpenThread |
| 36 | otNetworkDiagMleCounters Struct Reference OpenThread |
| 37 | Node Roles and Types OpenThread |
| 38 | https://openthread.io/guides/thread-primer/router-selection |

## I.    INTRODUCTION

1.      K.Mizra is a patent licensing company run by experienced management. The company focuses on high-value, high-quality patents and owns patent portfolios originating from a wide array of inventors, including patents and patent portfolios developed by well-known multinational corporations such as IBM, Intel, Rambus and others, as well as from research institutes such as Nederlandse Organisatie voor Toegespast Natuurwetenschappelijk Onderzoek (Netherlands Organization for Applied Scientific Research). By focusing on high-quality patents, K.Mizra provides a secondary market that enables inventors to recoup their research and development investments and to continue their innovations. K.Mizra offers licenses to its patents on reasonable terms and, in this way, plays an important role in the development of technologies that improve businesses and lives.

### A.    The Asserted Zero Trust Network Security Patent

2.      K.Mizra is the owner by assignment of United States Patent No. 8,234,705 ("the '705 Patent") ("the Asserted Zero Trust Network Security Patent"). The Patent wase involved in unsuccessful *Inter Partes* Review proceeding ("IPRs"), several now-resolved federal court litigations, and was originally invented by two highly-respected and prolific inventors—James A. Roskind and Aaron T. Emigh.

3.      The Asserted Zero Trust Network Security Patent was originally owned by Dr. Roskind's and Mr. Emigh's company, Radix Labs, LLC. Dr. Roskind and Mr. Emigh were then, and remain today, focused on innovation, conducting new research, developing new technologies, and creating new and innovative computer products and systems.

4.      Dr. Roskind, a co-inventor of these Patents, has bachelors, masters, and doctorate degrees from MIT in both electrical engineering and computer science and is a named inventor of

over 300 U.S. patents. He has worked for Netscape as the Chief Architect and as the Netcenter Security Architect and was a co-founder of Infoseek, a company acquired by Disney for $770 million. Dr. Roskind also was a key developer of Google's "transport protocol" that provides the tech giant billions of dollars in value every year.

5.     Mr. Emigh, also a co-inventor of the Asserted Zero Trust Network Security Patents, graduated from the University of California, Santa Cruz with degrees in linguistics and computer and information sciences and is a named inventor of over 140 patents. Before working with Dr. Roskind, Mr. Emigh worked in various software-development positions, including software manager, architect, and engineer for Unicom and manager for the software development and technical marketing groups of Philips TriMedia. He has founded or co-founded many companies in addition to Radix Labs, LLC, including CommerceFlow, Inc., which was acquired by eBay for the technology that Mr. Emigh helped develop.

6.     After the Asserted Zero Trust Network Security Patent was issued, Dr. Roskind and Mr. Emigh recouped their research and development investment by selling certain technology rights and continued to work independently on their individual technological pursuits. K.Mizra ultimately acquired the Asserted Zero Trust Network Security Patent and licensed it to many major companies operating in the computer technology space. Some of those companies, including previously accused infringers, chose to test the validity of the Asserted Zero Trust Network Security Patent before accepting a license to the Patent.

7.     For example, accused infringers of the Asserted Zero Trust Network Security Patent previously sought IPRs by the Patent Trial and Appeal Board ("PTAB") of both of the Asserted Zero Trust Network Security Patents. A Final Written Decision ("Decision") issued in the IPR for the '705 Patent concluded that the petitioners had not shown by a preponderance of the

evidence that the claims at issue were unpatentable.  The '705 Patent IPR Decision was appealed to the U.S. Court of Appeals for the Federal Circuit ("CAFC"), resulting in a procedurally-focused remand back to the PTAB. The PTAB recently dismissed the IPR Petition with prejudice.

8.     The Asserted Zero Trust Network Security Patent was previously asserted by K.Mizra in this District against Cisco Systems, Inc. in *K.Mizra v. Cisco Systems, Inc*. (Civil Action No. 6:20-cv-01031-ADA), a case assigned to Judge Albright which resolved in September 2024, only a few weeks prior to trial being scheduled to commence. In that action, Judge Albright not only conducted a claim construction hearing and issued several important constructions of disputed claim terms, he also ruled on numerous summary judgment and *Daubert* motions as part of a final pretrial conference. As such, Judge Albright is well-versed in the technology involved with the Asserted Zero Trust Network Security Patent, K.Mizra and other issues here likely to be involved.

**B.     The Asserted Hyperparameter Tuning Patent**

9.     K.Mizra is also the owner by assignment of United States Patent No. 8,438,120 ("the '120 Patent" or "the Asserted Hyperparameter Tuning Patent"). The '120 Patent has not previously been asserted or involved in any post issuance proceedings and was invented by Stephan Alexander Raaijmakers of the Nederlandse Organisatie Voor Toegepast-Natuurwetenschappelijk Onderzoek TNO, a well-known and widely respected technology research institution ("TNO").

**C.     The Asserted Mesh Networking Patent**

10.     K.Mizra is also the owner by assignment of United States Patent No. 8,144,717 ("the '717 Patent" or "the Mesh Networking Patent"). The '717 Patent has also not previously been asserted or involved in any post issuance proceedings and was invented by Marinus Johannes Blange and Miodrag Djurica of the TNO.

**D.**     **K.Mizra's Licensing Model**

11.    The '705 Patent, '120 Patent and '717 Patents are collectively referred herein as "the Asserted Patents". K.Mizra remains ready, willing, and able to provide commercially reasonable licenses for its various patented technologies, including its Asserted Patents, to all entities who wish or need to use its covered technologies internally or in connection with products or services offered to others. As outlined below, Google is one such entity.

## II.     THE PARTIES

12.    K.Mizra is a Delaware limited liability company with a mailing address of 777 Brickell Avenue, #500-96031, Miami, Florida 33131, and operates in Florida.

13.    K.Mizra is the owner by assignment of the Asserted Patents.

14.    Upon information and belief, Google is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

15.    Upon information and belief, Google maintains an office in this District at 500 West Second Street, Austin, Texas 78701.

16.    Upon information and belief, Google employs hundreds of people in its Austin, Texas office, including persons with knowledge of the Google products and technology at issue in this case.

17.    Upon information and belief, Google is also registered to do business in Texas and may be served with process by serving Corporation Service Company, Google's registered agent in Texas located at 211 East Seventh Street, Suite 620, Austin, Texas 78701-3218.

### III.    JURISDICTION AND VENUE

18.    This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*, including 35 U.S.C. §§ 271, 281, and 284, among others. The Court has subject-matter jurisdiction over the claims raised in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

19.    This Court has personal jurisdiction over Google by virtue of, *inter alia*, its conduct of business in this District, its registration to do business in Texas, its appointment of a registered agent in Texas, its employment of hundreds of persons in its Austin office located in this District, and its substantial, continuous, and systematic contacts with the state of Texas and this District. Google intentionally markets and sells its infringing products directly and through agents to residents of Texas, enjoys substantial income from its business activities in the state of Texas and this District, and/or directly, by its own actions, and/or in combination with actions of customers and others under its control, has committed acts of patent infringement in this District at least by selling infringing products in this District.

### IV.    GENERAL ALLEGATIONS

#### A.    The Zero Trust Network Security Patent and Google's Infringement

20.    K.Mizra is the sole owner by assignment of the Asserted Zero Trust Network Security Patent with the full and exclusive right to enforce the Patent. K.Mizra is also entitled to sue to collect damages for all past infringement of the Asserted Zero Trust Network Security Patent.

21.    The '705 Patent, titled "Contagion Isolation and Inoculation," was issued by the USPTO to Inventors Roskind and Emigh on July 31, 2012. A true and correct copy of the '705 Patent is attached hereto as Exhibit 1 and incorporated by reference.

22.    The Asserted Zero Trust Network Security Patent claims priority to U.S. Provisional Application No. 60/613,909, filed on September 27, 2004 (the "Provisional Application") and is entitled to that priority date.

### 1.    Prior Licensing and Litigation Concerning the Asserted Zero Trust Network Security Patent

23.    The Asserted Zero Trust Network Security Patent has been owned by several entities, in addition to Radix and K.Mizra, with some of those entities issuing to third parties certain rights to the technologies covered thereby.

24.    K.Mizra has been involved in several actions it was required to institute to protect its patent rights, including actions involving the Asserted Zero Trust Network Security Patent. Most of those actions resulted in the execution of confidential patent license agreements.

25.    Google is not and has never been a licensee of the Asserted Zero Trust Network Security Patent nor had any rights to use technologies covered by the Patent. Google thus has no right (and is entitled to no right) to use technology covered by the Asserted Zero Trust Network Security Patent.

### 2.    Computer Network Security Problems In 2004 Solved by the Asserted Zero Trust Network Security Patents

26.    The technology described in the Asserted Zero Trust Network Security Patent was invented by Dr. Roskind and Mr. Emigh, two colleagues living in the same area who had similar interests in innovating computer-related technologies. In 2003, the inventors decided to create a business—Radix Labs, LLC—which focused on developing intellectual property related to various computer technologies, including computer network security technologies. The inventors focused on conceiving and reducing to practice inventions that they knew were needed (or soon

would be needed) in the computer networking industry and then on drafting patent applications to capture and protect their technological innovations.

27.     In September of 2004, the inventors filed the Provisional Application to which the Asserted Zero Trust Network Security Patent claims priority. The Provisional Application described technology that focused on securing a computer network against the threats to which it was exposed when computer endpoints (e.g., laptop computers, smart phones, tablets, etc.,) were connected to a computer network. The Provisional Application, and by natural extension the Asserted Zero Trust Network Security Patent, also focus on remedying and/or quarantining those threats to mitigate any damage to the secured network.

28.     Claims of the Asserted Zero Trust Network Security Patent are directed to technological solutions that address specific challenges grounded in computer network security. Maintaining the security of computer systems and networks is a tremendous concern for modern enterprises, since a breach of an internal network can have severe repercussions, including major financial losses, data theft, disclosure of sensitive information, network disruptions, data corruption, etc. The inventors of the Asserted Zero Trust Network Security Patent understood that while a network security appliance or hardware can be adept at keeping out unwanted external intrusions from the network, the most exploitable vulnerabilities of most networks are the end-user computers that roam throughout various public and private network domains, potentially exposing those computers to infection and then accessing and potentially infecting the entire and presumably secure computer network.

29.     For example, the '705 Patent explains that

Laptop and wireless computers and other mobile systems pose a threat to elements comprising and/or connected to a network service provider, enterprise, or other protected network to which they reconnect after a period of connection to one or more networks and/or systems that are not part of the service provider, enterprise,

7

or other protected network. By roaming to unknown domains, such as the Internet, and/or connecting to such domains through public, wireless, and/or otherwise less secure access nodes, such mobile systems may become infected by computer viruses, worms, backdoors, and/or countless other threats and/or exploits and/or have unauthorized software installed; have software installed on the mobile system by an operator of the protected network for the protection of the mobile system and/or the protected network removed or altered without authorization and/or have configurations, settings, security data, and/or other data added, removed, and/or changed in authorized ways and/or by unauthorized person.

*See, e.g.*, Ex. 1 at 1:14–31.

30.     The solution to these problems—as specified and claimed in the Asserted Zero Trust Network Security Patent—was an advanced departure from the conventional network access control solutions then in use and was then, as it remains today, patent eligible, highly valuable, novel, and non-obvious technology.

### 3.     K.Mizra's Asserted Zero Trust Network Security Patent Claims Are Presumed Valid

31.     K.Mizra asserts that Claims 12, 13, 16 and 19 of the '705 Patent have been directly infringed, either literally or under the doctrine of equivalents by Google. These claims are referred to herein as the "Asserted Zero Trust Network Security Claims."

32.     None of the Asserted Zero Trust Network Security Claims are directed to abstract ideas, and each employs inventive concepts and is directed to patent-eligible subject matter. All claims of the Asserted Zero Trust Network Security Patent are also presumed to be valid and enforceable against Google and others.

33.     Indeed, the Asserted Zero Trust Network Security Patent's specification and claims demonstrate that the need satisfied by the inventions of the Asserted Zero Trust Network Security Claims was long-felt in the industry and thus unconventional. As one example, the '705 Patent explains that mobile end user devices such as laptops and wireless computers pose a threat to protected network elements because those devices may access unsecure systems and thereby

"become infected by computer viruses, worms, backdoors, and/or countless other threats and/or exploits and/or have unauthorized software installed; have software installed on the mobile system by an operator of the protected network for the protection of the mobile system and/or the protected network removed or altered without authorization; and/or have configurations, settings, security data, and/or other data added, removed, and/or changed in unauthorized ways and/or by unauthorized person[s]." Ex. 1 at 1:23-31. Similarly, stationary systems such as desktop computers "may become infected, e.g., due to receipt and execution of malicious code via a network or other communication and/or a diskette and/or other removable media." Ex. 1 at 1:31-34. This poses a danger to a protected network because, when the user device connects to the protected network, "a system may infect or otherwise harm resources associated with the protected network before measures can be taken to detect and prevent the spread of such infections or harm. Ex. 1 at 1:34-38. The Asserted Zero Trust Network Security Patent's specification further provides that "[t]herefore, there is a need for a reliable way to ensure that a system does not infect or otherwise harm other network resources when connected to a protected network." *Id.* at 1:38-41.

34.    The specification (including the provisions quoted above), the figures (including those included below), and the text related to the figures further illustrate the complex, tiered network system architecture of the inventions captured by the Asserted Zero Trust Network Security Claims. These figures include the following:



FIG. 2B

*See* Ex. 1 at Fig. 2B.



*See id.* at Fig. 10A.

35.     The Asserted Zero Trust Network Security Claims focus on being able to receive, understand and act upon information provided by specific tamperproof hardware that must interact with unique software to improve network access control technology and protect a secure computer network and the data stored thereon from infected devices. As such, the Asserted Zero Trust Network Security Claims are eligible as a matter of law for patent protection under step one of *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

36.     All actions and steps recited in the Asserted Zero Trust Network Security Claims, including the act of quarantining endpoints or other computers, if necessary, require the involvement of various hardware components running dedicated software both before, during, and after the selection and isolation of an endpoint device. Said another way, claims directed to allowing a machine to automatically and dynamically select and isolate an unsafe device

attempting to access a secure network is not simply adding a generic computer component to a fundamentally human process. Rather, it is removing the once-necessary human intervention from a fundamentally mechanical process, an "improvement in the functioning of a" networked system that simply cannot be considered directed to an abstract concept. *Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016). These technological acts were unconventional and unknown in the art existing in 2004.

37. As the specification confirms, the improvement captured by the Asserted Zero Trust Network Security Claims is not simply quarantining an infected device, but it is instead a multi-faceted network system involving multiple interrelated software and hardware components to protect a network from known and unknown threats. Specifically, the Asserted Zero Trust Network Security Patent discloses that to reduce the burdens of having to manually identify, connect to, isolate, and remove malicious software from an infected endpoint, the networked system can direct an unclean endpoint (referred to in the Patent as a "host computer") attempting to connect to the secure network to a form of remediation, such as downloading a software patch or a software update, removing material from, enabling certain settings, etc. present on the endpoint. *See* Ex. 1 at 1:14–41.

38. Indeed, the inventions of the Asserted Zero Trust Network Security Claims are each tethered to these advances, none of which, individually, and certainly not as an ordered combination, was conventional in the computer network security field in 2004. Indeed, these claims recite then-unconventional systems and technology that automatically and dynamically detect an insecure condition by contacting a trusted computing base located on an endpoint, receiving a response therefrom, determining if that response contains a valid identification of cleanliness, and configuring and implementing any needed remediation action upon. *See, e.g.,* Ex.

1, Claim 19. More specifically, the Asserted Zero Trust Network Security Claims require a system to communicate with a "trusted computing base" to determine when a response includes a valid digitally signed attestation of cleanliness, and to control access to the network accordingly. These Asserted Zero Trust Network Security Claims are thus directed to a machine-implemented solution resolving a machine-specific problem, *i.e.* a machine's difficulty in detecting, isolating, and remediating infected endpoint devices (*e.g.*, host computers) to prevent contagion of and damage to the larger computer network.  These technological acts were completely unconventional in the relevant field in 2004.

### 4. Failed IPRs Brought Against the Asserted Zero Trust Network Security Patents

39.    Fortune 100 companies accused of infringing the Asserted Zero Trust Network Security Patent previously filed petitions for IPRs against it, alleging that the claims thereof should be held invalid as either anticipated or obvious considering art not previously considered. Ultimately, the PTAB instituted an IPR against the '705 Patent, with similar third party IPRs that were subsequently filed being joined to the first-filed and instituted IPR.

40.    The PTAB eventually issued its decision holding that no claims of the '705 Patent were unpatentable, finding that no asserted prior art reference alone or in combination satisfied the limitation of "providing . . . an IP address of a quarantine server configured to serve the quarantine notification page" that was present in all claims of the '705 Patent.

41.    The '705 Patent IPR Decision was then appealed to the CAFC, which reversed the PTAB's Decision on a few narrow procedural issues involving proof that the asserted prior art references would be combined by a person having ordinary skill in the art, as alleged by the petitioners.

42.    The IPRs have now all dismissed with prejudice by the PTAB.

### 5.    Google's Infringing Chrome Enterprise Premium Product

43.    Google has been and continues to make, sell, use, offer to sell, import into and/or export out of the United States a product known as Chrome Enterprise Premium ("CEP"), a computer network access and security product.  These actions directly infringe the Asserted Zero Trust Network Security Patent in violation of 35 U.S.C. § 271(a).  (Attached as Exhibit 2 and incorporated herein by this reference, is a preliminary claim chart explaining Google's infringing conduct.)

44.    CEP is a secure enterprise solution that provides integrated threat and data protection and offers scalable context-aware access controls for software-as-a-service (SaaS) and Web Apps, helping to mitigate data exfiltration from secure networks.  CEP achieves these goals by being designed to operate within an environment of endpoint that include a trusted computing base ("TCB") with a trusted platform module ("TPM") and a Chrome browser.  When such a configured endpoint seeks to enter a protected network, the CEP running on Google's cloud obtains posture information stored in the TCB's TPM of the endpoint.  CEP, which integrates several security features and functions that Google offers in CEP and in other products, such as Endpoint Verification, Context-Aware Access, certificate-based access, Verified Access, Policy Remediation, and others, then uses the provided information to make decisions about whether the requesting endpoint should be granted access to the protected network, if it should be remediated, quarantined, etc., and then sends to the endpoint appropriate information, etc.

45.    As Google has explained it:

Browsers are more than just a portal to the Internet: They are the new endpoint where almost every high-value activity and interaction in the enterprise takes place. Authentication, access, communication and collaboration, administration, and even coding are all browser-based activities in the modern enterprise.

14

Endpoint security is growing more challenging due to remote work, reliance on an extended workforce, and the proliferation of new devices that aren't part of an organization's managed fleet. As these trends continue to accelerate and converge, it's clear that the browser is a natural enforcement point for endpoint security in the modern enterprise. Gartner® research predicts "enterprise browsers will be the core platform for delivering workforce productivity and security software on managed and unmanaged devices for a seamless hybrid work experience."

**Get advanced security with Chrome Enterprise Premium**

Users around the world already use Chrome on their digital devices to access information and get work done safely across Windows, macOS, ChromeOS, Android, and iOS. As a leader in browser security, Chrome has built features and best practices that have disrupted, and then established, industry norms.

For example, we introduced advanced security sandboxing and novel exploit mitigations, and we lead the industry in our response time to zero-day vulnerabilities. We also continue to advance security, and recently announced work that uses AI to do privacy-preserving, real-time checks of websites to help protect users from increasingly sophisticated attacks. Chrome Enterprise Premium builds on the core capabilities available in Chrome Enterprise, which gives organizations the secure, reliable browser their employees prefer to use with management tools for IT and security teams built in.



Chrome Enterprise Premium offers additional advanced security capabilities, including:

- **Enterprise controls** enforce policies, manage software updates and extensions to align with enterprise policies, and support RDP, SCP, SSH and other TCP protocols;

- **Security insights and reporting** support event reporting, device reporting, and forensic capabilities for enterprise-wide visibility, and can integrate with other Google and third-party security solutions;

- **Context-aware access controls** can be scaled for web applications, can help enforce continuous Zero Trust access to SaaS and web-based apps with context-aware access control, and can mitigate data exfiltration risks for sanctioned and unsanctioned applications; and

- **Threat and data protection** delivers content inspection and data loss prevention, anti-malware, and anti-phishing using frontline intelligence and AI, dynamic URL filtering, and site categorization.

Organizations using Chrome Enterprise Premium benefit from Google's threat intelligence, security features, and Zero Trust access via Google's secure global network. *See* https://cloud.google.com/blog/products/identity-security/introducing-chrome-enterprise-premium, attached as Exhibit 3 and incorporated herein by this reference.

46.     CEP     is     based     on     Google's     "BeyondCorp"     product. *See, e.g.*, https://cloud.google.com/beyondcorp-enterprise/docs/access-protection#:~:text=Based%20on%20the%20BeyondCorp%20security,SSH%20access%20to%20virtual%20machines, attached as Exhibit 4 and incorporated herein by this reference; *see also* https://cloud.google.com/beyondcorp?hl=en, attached as Exhibit 5 and incorporated herein by this reference.  Google refers to BeyondCorp in some CEP-related documents and website pages. BeyondCorp currently is not an accused product, but K.Mizra reserves the right to allege infringement by BeyondCorp if discovery dictates and provides support for such an allegation.

**B.    The Asserted Hyperparameter Tuning Patent**

47.    K.Mizra is the sole owner by assignment of the Asserted Hyperparameter Tuning Patent with the full and exclusive right to bring suit to enforce the Patent. K.Mizra is also entitled to sue to collect damages for all past infringement of the Asserted Hyperparameter Tuning Patent.

48.    The '120 Patent, titled "Machine Learning Hyperparameter Estimation," was issued by the USPTO to Inventor Stephen Alexander Raaijmakers on May 7, 2013. A true and correct copy of the '120 Patent is attached hereto as Exhibit 6 and incorporated by reference.

49.    The Asserted Hyperparameter Tuning Patent is a U.S. National Phase filing of PCT/NL2008/050247 and claims priority to European Application Nos. 07106963.7 filed April 25, 2007 and 07112037.2 filed July 9, 2007.

**1.    Prior Licensing and Litigation Concerning
the Hyperparameter Tuning Patent**

50.    The Asserted Hyperparameter Tuning Patent has previously been licensed to various industry participants but has not been involved in any prior litigation.

51.    Google is not and has never been a licensee of the Asserted Hyperparameter Tuning Patent nor has it had nor does it have any rights to use technologies covered by the Patent. Google thus has no ownership or other rights (and is entitled to no rights) relating to the Asserted Hyperparameter Tuning Patent.

52.    No party licensed to the Asserted Hyperparameter Tuning Patent has used the technology claimed by the Asserted Hyperparameter Tuning Patent in a manner that requires marking under 35 U.S.C. § 287. K.Mizra is therefore not barred from seeking past damages for infringement of the Asserted Hyperparameter Tuning Patent under 35 U.S.C. § 287(a).

>        **2.      Problems in 2007 Solved By the
>                  <u>Asserted Hyperparameter Tuning Patent</u>**

53.      The technology described in the Asserted Hyperparameter Tuning Patent was invented by Stephen Raaijmakers and generally relates to improving the operation of Artificial Intelligence ("AI") through the improved automatic, systematic and computer implemented training techniques.  More specifically, AI typically uses models to perform specific tasks, and, at its most basic level, an AI model is a program that has been "trained" on a set of data to recognize certain patterns or to make certain decisions without further human intervention.  For example, an AI model could be used to automatically detect spam or other unwanted emails in a user's email inbox or distinguish between ripe and unripe fruit to be picked, etc. The '120 Patent uses the term "classifier" to refer to these types of AI models, as they are used to separate inputs (emails or fruit) into different classifications (spam or not spam/ripe or unripe).

54.      AI models use variables called "parameters" to determine what result it should produce (e.g., to determine whether to classify an email as spam or not spam). These parameters are not set manually. Instead, they are learned automatically during the training process. During training, the model may be exposed to a labeled dataset and the parameters can be adjusted to minimize prediction errors. For instance, in the spam email example, the AI model may be trained by exposing the model to a large number of emails that have been labeled as either spam or not spam.  The model identifies and thus learns the traits and characteristics found in these various emails that are indicative of a spam email or not spam email. Automatically adjusting the parameters of the model to minimize the times when a spam email is marked as not spam, or vice versa, is the goal of parameter-based training.

55.      AI models are generally trained for a specific purpose.  However, training a full model is time consuming and, in some cases, has given way to the use of foundational models,

which are models that are pre-trained on large, genericized datasets. These foundational models can later be fine-tuned for use in addressing a particular problem or issue by, for example, feeding it a set of additional relevant data and training upon that dataset. By way of example, a foundational AI model for diagnosing medical conditions could be fine-tuned by training it using various medical records. Similarly, a foundational large language model ("LLM") like ChatGPT could be fine-tuned to adjust its conversational tone by training it on sample texts representing a desired communication style.  Using a foundational AI model is like getting a shirt and later tailoring it to fit your body, rather than starting with fabric, thread, and a needle.

56.    As AI models become more advanced and versatile, they also demand more data and computing power to be properly trained. One of the main challenges in this exploding field of technology is efficiently training these models, which typically is done by configuring variables in a model's learning process.   These variables are known as hyperparameters.  The hyperparameters may, for example, define the architecture (and thus the size) of the model, as well as, how the model changes based on the training data it digests and that will effect how efficiently and effectively the model is trained. For example, a hyperparameter called the learning rate may be used to control how much a model adjusts its parameters during training. If the learning rate of the model is too low, it will take a long time for the model to reach an acceptable result. On the other hand, if the learning rate is too high, the model may overreact to each training round, bouncing around an optimum result instead of converging on that result. Different hyperparameters may be used depending on whether a user is training a brand-new model or fine-tuning a foundational model. In either case, though, identifying the right hyperparameters and their values during the model training process improves the model's efficiency and thus the predictions or decisions to be output by the model.

57. Claims of the Asserted Hyperparameter Tuning Patent are directed to technological solutions that address specific challenges grounded in the systematic and automatic tuning of hyperparameters so that efficient and effective AI models can be computer generated. Creating these models is a tremendous concern for modern enterprises, since they are now being used in all manner of human endeavor, from drug discovery, to providing banking efficiencies, etc.

58. The inventor of the Asserted Hyperparameter Tuning Patent understood that while basic models that trained on parameters existed prior to 2007, as the data to be analyzed become more and more voluminous and complex, the use of just parameters in developing a model would not be enough. Rather, the additional use of hyperparameters, that could automatically and systematically be optimized by the computing system that was training the model was needed. The inventor also realized that the existing methods for estimating and selecting hyperparameters were unsuitable in many cases. For example, the '120 Patent discloses:

> Hyperparameters may be determined using various methods, for example heuristic or statistical optimization methods. However, many heuristic methods are ad hoc methods, while not all statistical optimization methods are suitable for determining hyperparameters.

The inventor thus recognized that a new paradigm needed to be developed. That paradigm was then well before its time invented and is disclosed in the '120 Patent.

59. For example, the '120 Patent explains that a method of determining hyperparameters in a machine learning system is disclosed. The method is iterative, and with each computer implemented iteration, a random or pseudorandom sample of hyperparameter vectors selected from a set of possible hyperparameter vectors must be considered, updating the estimate of the target hyperparameter vector by selecting for use the best vector in the present and previous iterations. The '120 Patent specification further explains that:

> By selecting from the random sample a or the hyperparameter vector producing the best result in the present and any previous iterations, and using said

20

selected hyperparameter vector to update the estimate of the target hyperparameter vector, the properties of the best performing hyperparameters are used to guide the next iteration [of the hyperparameter selection process]. In this way, a method similar to the cross-entropy method [used for selection of parameters] can be used effectively for determining hyperparameters, even when the hyperparameters are not continuous and their effects are not transparent. By using the method according to the present invention, an improved classification [i.e. model] accuracy is achieved.

…

In a preferred embodiment, the method according to the Present invention further comprises the steps of:
   selecting from the random sample a further hyperparameter vector producing the best result in any previous iterations, and
   restricting the random sample of hyperparameter vectors by using the further selected hyperparameter vector.
The step of restricting the random sample preferably involves the use of an interval surrounding the further selected hyperparameter vector which produces the best result in any previous iteration.

…

In a preferred embodiment, $E^t$ is the hyperparameter vector $X^t$, at iteration t producing the best result $S(X^t_i)$ in the present iteration t and all previous iterations (if any). The random sample $X^t_i$, has elements $X^t_{ij}$, while the step of updating the hyperparameters comprises the step of determining the (target) hyperparameter $v^t_j$, where

$$v^t_j = \frac{\sum_{i=1}^{n} I\{S(X^t_i) \geq \gamma^t\} W(X^t_i; E^t) X^t_{ij}}{\sum_{i=1}^{n} I\{S(X^t_i) \geq \gamma^t\} W(X^t_i; E^t)},$$

wherein $\gamma^t$ is a threshold value, W is a weighting function and $I\{S(X^t_i) \geq \gamma^t\}$ is an indicator function which is equal to 1 if $S(X^t_i)$ greater than or equal to the threshold value $\gamma^t$, and else is equal to 0. The weighting function W is preferably given by

$$W(X^t_i; E^t) = 1 - \frac{\sqrt{\sum_{j=1}^{m} (X^t_{ij} - E^t_j)^2}}{\sqrt{\sum_{j=1}^{m} (X^t_{ij})^2} \sqrt{\sum_{j=1}^{m} (E^t_j)^2}}.$$

Accordingly, the step of updating the hyperparameters may involve a weighting function based upon a distance function, preferably a Euclidean distance function.

21

It is noted that when the Euclidean distance between $E^t$ and $X^t_{ij}$, is zero, the weighting function W is equal to one.

The method according to the present invention is typically carried out by computer apparatus, for example a general purpose computer system comprising a processor and an associated memory, one part of the memory storing a soft ware program for instructing the processor to carry out the method steps of the present invention, and another part of the memory storing data, said data comprising the hyperparameter values referred to above.

*See, e.g.*, Ex. 6 at 2:1–4:14.

60.    The solution to the problems identified in the '120 Patent—as specified and claimed in the Asserted Hyperparameter Tuning Patent—was an advanced departure from the conventional tuning of hyperparameters in AI models in use in 2007 and was then, as it remains today, patent-eligible, highly valuable, novel, and non-obvious technology.

### 3.    K.Mizra's Asserted Hyperparameter Tuning Patent Claims Are Presumed Valid

61.    None of the Asserted Hyperparameter Tuning Patent Claims are directed to abstract ideas, and each employs inventive concepts and is directed to patent-eligible subject matter. All claims of the Asserted Hyperparameter Tuning Patent are also presumed to be valid and enforceable against Google and others.

62.    The subject matter of the Asserted Hyperparameter Tuning Patent is focused on problems in machine learning systems. *See, e.g.,* Ex. 6 at 1:6-9, 1:13-23, 2:1-19, 3:46-53, 4:9-13. Indeed, hyperparameters are used by machine learning systems to determine the parameters for a classifier in a machine learning system. In other words, the solution described by the claims of the Asserted Hyperparameter Tuning Patent is necessarily rooted in computer technology.

63.    Moreover, selecting the appropriate hyperparameters is vital to the speed and efficiency of the training computer and the machine learning system. Selecting inappropriate hyperparameters can lead to myriad problems in training the AI model, including underfitting or

overfitting, which in turn could lead to a training system that is inefficient, takes too long to determine the parameters, and/or consumes massive amounts of power; or a resulting machine learning system with a poorly-trained classifier (because the model never converged) which thus misclassifies a significant amount of data.

64.     The Asserted Hyperparameter Tuning Patent Claims are directed to a machine-implemented, iterative process for locating, selecting and utilizing in a model an optimized hyperparameter. As such, the Asserted Hyperparameter Tuning Patent Claims recite inventions with specific applications or improvements to technologies in the marketplace and cannot be considered abstract or patent ineligible under relevant law.

### 4.     Google's Infringing Vertex AI Studio Product

65.     Google's Vertex AI Studio is part of the Google Cloud Platform and is a complete system for building, training, and using AI models. It offers a range of tools and APIs (Application Programming Interfaces) that let users either create and train their own models from scratch, or work with Google's foundation models, like Gemini, Imagen, Codey, and Chirp, and tailor them for specific needs.  As is here relevant, Vertex AI provides several options for training all manner of models. One of the most powerful of these provides a user with complete control over the model development process by allowing them access to powerful hyperparameter tuning and optimization options. These can be implemented using Google's Vertex AI Vizier. It is Google's provision of this computer implemented hyperparameter tuning ability that takes advantage of iterative, randomized/pseudo-randomized hyperparameter tuning techniques, that makes Google's Vertex AI so valuable to its customers.  Google's usurpation of the critical '120 Patent's patented technology without K.Mizra's authorization allows Google to provide to its customers highly tuned

and effective AI models, generating significant revenues and reputational prestige for Google, all to the injury of K.Mizra.

66.     Google has been making, selling, using and offering for sale AI products and services that infringe the Asserted Hyperparameter Tuning Patent in violation of 35 U.S.C. § 271 (collectively, "the Accused Hyperparameter Tuning Instrumentalities"). These Accused Hyperparameter Tuning Instrumentalities include, but are not limited to, Google's Vertex AI system, the sale, offer for sale, use, and/or manufacture in the United States of which constitutes infringement of at least claim 1 of the Accused Hyperparameter Tuning Patent, either literally or under the doctrine of equivalents.

### C.     The Asserted Mesh Networking Patent

67.     K.Mizra is the sole owner by assignment of the Asserted Mesh Networking Patent with the full and exclusive right to enforce the Patent. K.Mizra is also entitled to sue to collect damages for all past infringement of the Asserted Mesh Networking Patent.

68.     The '717 Patent, titled "Initialization of a Wireless Communication Network," was issued by the USPTO to Inventors Blange and Djurica on March 27, 2012. A true and correct copy of the '717 Patent is attached hereto as Exhibit 7 and incorporated by reference.

69.     The Asserted Mesh Networking Patent is a U.S. National Phase filing of PCT/NL2007/0000001, filed on December 2, 2007, and is entitled to that priority date. The Asserted Mesh Networking Patent further claims priority to European Patent Application No. EP 05078044, filed December 30, 2005, and is entitled to that priority date.

### 1.     Prior Licensing and Litigation Concerning the Mesh Networking Patent

70.     The Mesh Networking Patent has previously been licensed to various industry participants but has not been involved in any prior litigation.

71.     Google is not and has never been a licensee of the Asserted Mesh Networking Patent nor has it had nor does it have any rights to use technologies covered by the Patent. Google thus has no ownership or other rights (and is entitled to no rights) relating to the Asserted Mesh Networking Patent.

72.     No party licensed to the Asserted Mesh Networking Patent has used the technology claimed by the Asserted Mesh Networking Patent in a manner that requires marking under 35 U.S.C. § 287. K.Mizra is therefore not barred from seeking past damages for infringement of the Asserted Mesh Networking Patent under 35 U.S.C. § 287(a).

### 2.     Problems in 2007 Solved By the Mesh Networking Patent

73.     The technology described in the Mesh Patent was invented by Marinus Johannes Blange and Miodrag Djurica and generally relates to creation of a flexible mesh wireless network.

74.     Although wireless communications networks were known in the art prior to the invention, the known networks had several drawbacks. For example, there existed known techniques for routing messages in wireless networks. *See generally* Ex. 7 at 1:13-58. However, as explained in the '717 Patent, these techniques "require[d] transmission of information via sensor stations before the routing topology [of the network] has been defined." *Id.* at 1:59-62. "This complicates the (sensor) stations, because they will have to support different modes of communication while operating in a low-power mode." *Id.* at 1:62-64. As further explained in the '717 Patent, the existing techniques also resulted in either slow or inefficient networks:

> If forwarding of information is only done using the definite routing topology, a central approach is slow (each station has to wait until its upward station has been centrally assigned a route) and a decentral approach is inefficient (a routing topology with an unnecessary amount of branches has been created).

*Id.* at 1:64-2:2.

75.    Another known protocol was a mobile communications protocol which uses two types of networks: a high power network and a low power network. *See generally* Ex. 7 at 2:9-57. However, the '717 Patent notes that "[t]he use of two types of network without central unit makes this system complex and inefficient in bandwidth use." *Id.* at 3:1-2.

76.    The solution to these problems—as specified and claimed in the Asserted Mesh Networking Patent—was an advanced departure from the conventional networking solutions then in use and was then, as it remains today, patent eligible, highly valuable, novel, and non-obvious technology.

### 3.    K.Mizra's Asserted Mesh Networking Patent Claims Are Presumed Valid

77.    None of the Asserted Mesh Networking Patent Claims are directed to abstract ideas, and each employs inventive concepts and is directed to patent-eligible subject matter. All claims of the Asserted Mesh Networking Patent are also presumed to be valid and enforceable against Google and others.

78.    The subject matter of the Asserted Mesh Networking Patent is focused on problems in wireless mesh networks, and in particular problems related to creating a new wireless mesh network and/or attaching a new station to an existing wireless mesh network. *See, e.g.,* Ex. 7 at 1:59-2:8, 2:58-3:2, 3:6-15, 3:59-67, 5:11-14. The solution described by the claims of the Asserted Mesh Networking Patent is necessarily rooted in wireless mesh networking technology and presumptively patent eligible.

79.    Moreover, the techniques specified and claimed in the Asserted Mesh Networking Patent Claims provides various technical benefits to the network. For example, Claim 11 of the Asserted Mesh Networking Patent is directed to, among other things, a "processor circuit being configured to switch to establish an associated route for communication with an association unit

26

during subsequent communication of operating messages to an association unit, the associated route including a source of the association grant, and, if the source of the association grant is not the association unit, the operating route between the source of the association grant and the association unit previously established for the source of the association grant in response to association request messages and/or the association grants for intermediate stations." Use of the claimed technique improves the speed of the network by providing the associated route to each station that joins a network, allowing the source of the association grant to provide the route information directly rather than retrieving it from the association unit, improving the speed with which the network can heal/form itself. It further eliminates unnecessary communications between the source of the association grant and the association unit, conserving bandwidth (and thus allowing more bandwidth for other communications) and conserving power of the various stations located within the associated route. As noted in the Asserted Mesh Networking Patent, power consumption is a key consideration in low power devices often found in mesh networks. Ex. 7 at 5:11-14; *see also id.* at 11:30-42.

80.     The Asserted Mesh Networking Claims are directed to wireless networks and stations within wireless networks that implement the techniques described for allowing new stations to efficiently and effectively join the network. As such, the Asserted Mesh Networking Claims recite inventions with specific applications or improvements to technologies in the marketplace and cannot be considered abstract or patent ineligible under relevant law.

### 4.     Google's Infringing Nest Devices

81.     Google Nest is a line of products for home networking, allowing a user to control various Google and third-party smart devices throughout the Google Home app. On information and belief, Google Nest was previously known as Google Home.

82.    Google offers a wide variety of home networking devices under the Google Nest brand. Many of these devices use a networking protocol called Thread.

83.    Thread is a networking protocol designed for low-power Internet of Things devices operating in an IEEE 802.11.15.4 wireless mesh network. It may be used alongside other networks, such as a Wi-Fi network, in a user's home. Thread was developed by the Thread group, which Google founded with other member companies in 2014.

84.    Thread is built into many new smart devices such as smart bulbs, locks, sensors, and the like. Thread is used to create a mesh network in which each new smart device connects to the next nearest smart device, giving users more networking coverage and making the entire network more robust. If one device in the network fails, another can step in to maintain the signal, allowing the network to heal itself rapidly, effectively and efficiently.

85.    A device in a Thread network may be either a router, which may forward data packets for other network devices and provides commissioning for devices trying to join the Thread network, or an end device, which communicates with a single router and does not forward packets for other network devices. An end device may convert itself into a router when a new device joins the network.

86.    A special case of a router is a border router, which can forward information between a Thread network and a non-Thread network. For example, a border router may allow a user to control the devices on a Thread network through the Wi-Fi network via a border router.

87.    An exemplary Thread network including a border router, routers, and end devices is shown below:



Ex. 8, "Thread Play Services APIs," (available at https://developers.home.google.com/matter/thread (accessed May 12, 2025) and incorporated by reference) (annotated).

88.    Google offers a wide range of products that use the Thread networking protocol. For example, Google offers several hubs for Google home that include a built-in Thread router, including the Nest Hub, Nest Hub Max, Nest Wifi Pro, and Google TV Streamer.

> Google devices like the Nest WiFi, Google Nest Hub Max and Google Nest Hub (2nd gen) have Thread radios built-into them and act as Thread Border Routers.

*Id.*; *see also* Ex. 9, "Connect Thread smart devices with Google TV Streamer (4K)," (available at https://support.google.com/chromecast/answer/15178609 (accessed May 21, 2025) and incorporated by reference).

89.    In addition, Google hub products such as the Google TV Streamer, Nest Hub (2nd Gen), Hub Nest Max Fuchsia, Nest Wi-Fi Point, and Nest Wi-Fi Router are certified as Built on Thread by the Thread Group.

90.    As another example, Google offers a routing device called the Nest Connect.

**Nest Connect**



Ex. 10, Nest Connect – Range Extender for Detect & Guard – Google Store," (available at https://store.google.com/product/nest_connect (accessed May 13, 2025) and incorporated by reference)). The Nest Connect includes a Thread radio that allows communication between a Thread border router and a peripheral device such as the Nest x Yale Lock.

> In an emailed statement, Grant Erickson, president of the Thread Group said, "Nest Detect relies
> on Thread's low power architecture to last for long periods of time on one battery. Nest Connect is
> a Thread router, which seamlessly extends both the reach and connectivity of the Thread network.
> Nest Guard provides seamless IP-based routing between Thread, Wi-Fi, and cellular, and their
> interoperability with the Yale Linus Lock is the posterchild of Thread's benefits in action."

Ex. 11, "Nest debuts Nest Secure home system and has a Thread router called Nest Connect," (available at https://staceyoniot.com/nest-debuts-nest-secure-home-system-and-has-a-thread-router-called-nest-connect/ (accessed May 13, 2025) and incorporated by reference).

91.     Yet another example, Google offers various peripheral devices that include a Thread radio such as the Nest x Yale Lock.



Ex. 12, "Nest x Yale Lock – Key-Free Smart Deadbolt – Google Store," (available at https://store.google.com/product/nest_x_yale_lock (accessed May 13, 2025) and incorporated by reference).

92.     Additional peripheral devices offered by Google that include a Thread radio include the Google Nest Learning Thermostat and the Google Nest Protect and CO alarm.

93.     Google has been making, selling, using and offering for sale products including Thread radios that infringe the Asserted Mesh Networking Patent in violation of 35 U.S.C. § 271

(collectively, "the Accused Mesh Networking Instrumentalities"). These Accused Mesh Networking Instrumentalities include, but are not limited to, Google's Nest home networking products identified above, the sale, offer for sale, use, and/or manufacture in the United States of which constitutes infringement of at least claim 11 of the Accused Mesh Networking Patent, either literally or under the doctrine of equivalents.

94.     K.Mizra expects that discovery will reveal additional products that include Thread radios and infringe the Asserted Mesh Networking Patents, which may include additional Google Nest products and/or products that are not marketed under the Google Nest brand. For example, there are reports that at least some Google Pixel 9 devices may include a Thread radio. *See, e.g.,* Ex. 13, "Pixel 9 series arrives at the FCC, includes Thread," (available at https://9to5google.com/2024/07/12/pixel-9-fcc/ (accessed May 23, 2025) and incorporated by reference).

## V.     FIRST CLAIM FOR RELIEF
### (Patent Infringement Under 35 U.S.C. § 271 of the '705 Patent)

95.     K.Mizra incorporates paragraphs 1 through 94 as though fully set forth herein.

96.     Claim 19 of the '705 Patent states:

[preamble] A computer program product for protecting a network, the computer program product being embodied in a non-transitory computer readable medium and comprising computer instructions for:

[A] detecting an insecure condition on a first host that has connected or is attempting to connect to a protected network,

[B] wherein detecting the insecure condition includes:

[B1] contacting a trusted computing base associated with a trusted platform module within the first host,

[B2] receiving a response, and determining whether the response includes a valid digitally signed attestation of cleanliness,

[C] wherein the valid digitally signed attestation of cleanliness includes at least one of an attestation that the trusted computing base has ascertained that the first host is not infested, and an attestation that the trusted computing base has ascertained the presence of a patch or a patch level associated with a software component on the first host;

[D] when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantining the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network,

[E] wherein preventing the first host from sending data to one or more other hosts associated with the protected network includes

[E1] receiving a service request sent by the first host, serving a quarantine notification page to the first host when the service request comprises a web server request,

[E2] and in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host configured to provide data usable to remedy the insecure condition; and

[F] permitting the first host to communicate with the remediation host.

Ex. 1 at 22:14–49.

97. The preamble of Claim 19 is nonlimiting. But if it is interpreted to be otherwise, CEP is a "computer program product for protecting a network." For example, Google touts that CEP is "Google Cloud's zero-trust solution that enables an organization's workforce to access web applications securely from anywhere, without the need for VPN and without fear of malware, phishing, and data loss":

Chrome Enterprise Premium is Google Cloud's zero-trust solution that enables an organization's workforce to access web applications securely from anywhere, without the need for VPN and without fear of malware, phishing, and data loss.

By using Chrome Enterprise Premium, you can manage access for apps on Google Cloud, other clouds, and on-premises, define and enforce access policies based on user, device, and other contextual factors, and make apps more accessible and responsive through Google's global network.

*See* Ex. 14, p. 1 (available at https://cloud.google.com/beyondcorp-enterprise/docs) (last accessed mid Jan. 2025 and incorporated by reference). Additionally, CEP provides endpoint (*e.g.*, "host" computer,) posture assessments and ensure that endpoints meet security and compliance policies before they are allowed to access a protected network. *See id.* Accordingly, and to the extent the preamble of Claim 19 is deemed limiting, CEP meets the limitation.

98.    CEP also meets the requirements of limitation A of Claim 19, which requires "detecting an insecure condition on a first host that has connected or is attempting to connect to a protected network." For example, CEP delivers endpoint posture assessments and ensures that endpoints meet security and compliance policies before they are allowed to connect to secure resources, i.e. network, housed on the Google Cloud:

# Endpoint Verification overview 

Send feedback

This document describes the basic concepts of Endpoint Verification.

Endpoint Verification lets security administrators or security operations professionals secure Google Cloud, on-premises apps and resources, and Google Workspace apps.

Endpoint Verification is part of Google Cloud Chrome Enterprise Premium and is available to all Google Cloud, Cloud Identity, Google Workspace for Business, and Google Workspace for Enterprise customers.

## When to use Endpoint Verification

Use Endpoint Verification when you want an overview of the security posture of the devices that are used to access your organization's resources, such as laptops and desktops.

As a security administrator or security operations professional, your goal is to manage secure access to your organization's resources. The employees of your organization can use either the company-owned devices or their unmanaged personal devices to access the organization's resources. When Endpoint Verification is installed on the devices that access your organization's resources, it collects and reports device inventory information. You can use this device inventory information to manage secure access to your organization's resources.

When paired with the other offerings of Chrome Enterprise Premium, Endpoint Verification helps enforce fine-grained access control on your Google Cloud resources.

*See* Ex. 15, Endpoint Verification Overview, p. 1 (available at https://cloud.google.com/endpoint-verification/docs/overview) (last accessed mid Jan. 2025 and incorporated by reference).

> Chrome Enterprise Premium presents a security model that allows for greater security posturing and policy for both applications and devices, while providing end users a better user experience no matter where they access from or what type of device they use to do so:
>
> - For administrators:
>   - Strengthen security posture to account for dynamic changes in a user's context.
>   - Shrink the access perimeter to only those resources that an end user should be accessing.
>   - Enforce device security postures for employees, contractors, partners, and customers for access, no matter who manages the devices.
>   - Extend security standards with per-user session management and multifactor authentication.
> - For end users:
>   - Allow all end users to be productive everywhere without compromising security.
>   - Allow the right level of access to work applications based on their context.
>   - Unlock access to personally-owned devices based on granular access policies.

*See* Ex. 16, Chrome Enterprise Premium Overview, pp. 1–2 (available at https://cloud.google.com/beyondcorp-enterprise/docs/overview) (last accessed mid Jan. 2025 and incorporated by reference). Endpoint Verification is a Google webapp that is integrated into and used by various Google products, including CEP.

99.     CEP further meets limitation B1 of Claim 19, which requires that "detecting [an] insecure condition includes . . . contacting a trusted computing base associated with a trusted platform module within the first host."  For example, CEP uses "strong key protection" such as "secure cryptographic storage such as TPMs and OS keystores." *See* Ex._17, How To Prevent Account Takeovers With New Certificate-Based Access, p. 1 (available at https://cloud.google.com/blog/products/identity-security/how-to-prevent-account-takeovers-with-new-certificate-based-access) (last accessed mid Jan. 2025, annotated to show where in the architecture CEP and the First host reside, and incorporated by reference).  As the below annotated Google produced figure establishes, many products, including CEP, are integrated into Google Cloud.  In operation, what Google calls a Trusted Device (top red box below) and the '705 Patent calls a "first host" or "endpoint" (noted in top green box below),  includes a TCB/TPM (see bottom red box below) and uses a Chrome browser, working with other Google Software installed on the Trusted Device, for contact between applications, web apps, virtual machines, etc., operating within the Google Cloud Platform, including CEP.



*See id.* at 2 (annotated). Some of the information CEP requests from the Trusted Device, i.e. the first host, are digitally-signed certificates housed in the TCB/TPM to determine whether the first host is secure and can be trusted to access protected resources, i.e. networks, also housed within the Google Cloud:

Certificate-based access can help you build a multi-layered defense against account takeovers, bolster data security, and maintain user trust. At Google, we have used this unique Zero Trust approach for many years as a strong defense to protect our technical infrastructure and employees. Now with CBA, we are extending this same level of security to our Google Cloud customers. Here are the key attributes of this approach:

- **Certificate-based access control**: Granular access policies with X.509 device certificates ensures only legitimate users with the correct certificate can access cloud resources.
- **Protections beyond initial login**: In contrast to using mTLS only for authentication, CBA also evaluates every authorization request to help safeguard resource access.
- **Strong key protection:** CBA's use of mTLS leverages secure cryptographic storage such as TPMs and OS keystores. Tooling such as Enterprise Certificate Proxy (ECP) are offered to users that empower them to safeguard private keys helping to ensure keys remain inaccessible to attackers without physical device access.

CBA allows you to enforce certificate-based authentication for all of Google Cloud, including specific resources (VM, Console, API), individual groups or organizations, across multiple end user vectors from browser to gcloud and terraform command-line-interfaces. It is integrated with many services in Google Cloud for effective access enforcement to cloud resources. For example, Context-Aware Access for Google APIs and the Cloud Console, Identity Aware Proxy (IAP) for web apps and workloads, and VPC Service Controls (VPC-SC) for network enforcement.

*See id*. at 4 (annotated).  As the above Google produced system architecture description establishes, CEP works with CBA to detect a possible insecure condition on a Trusted Device by contacting a trusted computing base associated with a trusted platform module that is located within the Trusted Device and meets the requirements of limitation B1 of Claim 19 of the '705 Patent.

100.    To be clear, the "first host," i.e. the Trusted Device in Google's vernacular, is not an active element of the Asserted Clams.  Rather, it is a component of the "environment" in which the active claim elements must function. Recently, the Federal Circuit explained "environmental" claiming and the role it plays in determining direct infringement. *INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4th 1361 (Fed. Cir. 2022). As explained in *INVT:*

> [t]he base station is part of "the environment" in which the [actively claimed] user device must function. *Advanced Software Design Corp. v. Fiserv, Inc.,* 641 F.3d 1368, 1374 (Fed. Cir. 2011). The claims have specific requirements for the data signal that the user device's receiving section and data obtaining section handle and

process when the device is activated and put into operation. . . . To understand whether a user device can ever receive a data signal with the particularized characteristics set forth in the claim, it is necessary to know whether the base station (i.e., the communicating party) is capable of transmitting that particular type of data signal to the user device. ***Therefore, although the recited base station is not "a limitation on the claimed invention itself,"*** *Nazomi Communs., Inc. v. Nokia Corp.,* 739 F.3d 1339, 1345 (Fed. Cir. 2014*), **in the sense that an infringer would not need to, for instance, use, make, or sell the base station***, the base station's operation affects whether the claims are met, *see, e.g.*, *Advanced Software Design,* 641 F.3d at 1373-74.

In *Advanced Software*, the claimed invention was for validating a check, to prevent check fraud, and involved either decrypting or encrypting information on the check. The preamble of the claim set out that the check included "selection information [that] is encrypted" to generate a control code and a "control code [which] is printed on the [check]." We held that these steps in the preamble "define[d] the financial instrument that the claimed system validates" as opposed to setting forth steps that would have to be performed by the accused infringer. *Advanced Software*, 641 F.3d at 1373-74 & 1374 n.1. Nevertheless, the accused infringer would infringe "only by validating checks that [had] been encrypted and printed in accordance with steps described in the preamble." *Id*. at 1374.

Like in *Advanced Software*, the claimed device of the [INVT] patent operates in an environment that involves actions of another device (the communicating party, i.e., the base station). The claimed device's capability of performing the recited functions depends on being supplied a certain modulated and encoded signal, which, in turn, requires the supplier (the communicating party) to actually supply that signal. Because the communicating party (base station) generates the necessary environment, its operations must be known to determine whether the accused device infringes, i.e., is capable of performing the claimed functions.

*Id.* at 1375 (emphasis added); *see also Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1308-09 (Fed. Cir. 2011) (holding that claimed "station forming part of a registration system . . . including local licensee unique ID generating means," only "define[d] the environment in which that [remote] registration station must function.").

101.    Claim 19 of the asserted '705 Patent recites a "computer program product for protecting a network . . ." and that product performs the following active functions:

> **Receiving** a service request from a first host;

**Contacting** a trusted computing base (TCB) associated with a trusted platform

module (TPM) located within the first host;

**Receiving** a response from the TCB;

**Determining** from that response whether the first host is infested or clean;

**Quarantining,** if infestation is detected, the first host; and

**Permitting** the first host to communicate with a remediation host.[1]

102.    CEP is a computer program product that protects resources found on Google Cloud

and performs each active recited function of the claims, i.e., the bolded terms, as explained herein,

specifically including in the exhibits hereto, which are incorporated herein by this reference. The

rest of the claim language, specifically including the "first host," is environment within which the

active verbs of the claim must operate.  K.Mizra thus need not establish that Google supplies the

"first host" for it to prove that Google directly infringes the asserted claims.  That said, though,

---

[1] Claim 19, with the active verbs highlighted, is here provided for ease of reference:

19. A computer program product for protecting a network, the computer program product being embodied in a non-transitory computer readable medium and comprising computer instructions for:

detecting an insecure condition on a first host that has connected or is attempting to connect to a protected network, wherein detecting the insecure condition includes contacting a trusted computing base associated with a trusted platform module within the first host, receiving a response, and determining whether the response includes a valid digitally signed attestation of cleanliness, wherein the valid digitally signed attestation of cleanliness includes at least one of an attestation that the trusted computing base has ascertained that the first host is not infested, and an attestation that the trusted computing base has ascertained the presence of a patch or a patch level associated with a software component on the first host;

when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantining the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network, wherein preventing the first host from sending data to one or more other hosts associated with the protected network includes receiving a service request sent by the first host, serving a quarantine notification page to the first host when the service request comprises a web server request, and in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host configured to provide data usable to remedy the insecure condition; and

permitting the first host to communicate with the remediation host.

Google does supply all relevant portions of the first host and created a secure network architecture in which that first host is to operate.

103.    Limitation B2 requires that "detecting the insecure condition" also includes "receiving a response and determining whether the response includes a valid digitally signed attestation of cleanliness." CEP meets this limitation as it receives from the first host computer, i.e. the Trusted Device, requested information and then determines, based on the information received, whether the Trusted Device that is attempting to access secure resources housed in the Google Cloud (*i.e.*, a protected network) is secure and trusted. *See, e.g.*, *id.* This process requires back-and-forth communication between CEP and the Trusted Device concerning the cleanliness of the first host computer/endpoint device:

41

**How the Google APIs validate device identity**

The TLS protocol uses a technique called public key infrastructure (PKI), which relies on a pair of asymmetric keys: a public key and a private key. Anything encrypted with the private key can be decrypted only with the public key. The Google Cloud APIs use the TLS protocol to verify the identity of a device by decrypting the message encrypted by the private key using the public key of the certificate during the mTLS handshake. The successful decryption proves the possession of the private key which is only available from trusted devices.

To enable the mTLS handshake and validation process, a client must do the following:

- Establish an mTLS connection with the Google APIs by using mTLS-specific API endpoints. The mTLS-specific endpoints have the following format: `[service].mtls.googleapis.com`

- Discover and use the device certificate during the mTLS handshake. If you are using Endpoint Verification for certificate deployment, this type of certificate is automatically discovered and used by the supported clients.

The following diagram illustrates the mTLS handshake between a client and a Google API server:



*See* Ex. 18, Understand Mutual TLS at Google Cloud, p. 1 (available at

https://cloud.google.com/beyondcorp-enterprise/docs/understand-mtls) (last accessed mid Jan.

2025 and incorporated by reference). Additionally, CPE checks digital signatures to determine the

cleanliness of the host computer:

# Deploy Endpoint Verification to use with certificate-based access 🔖 ▾

Send feedback

As part of a Chrome Enterprise Premium solution, Endpoint Verification provides critical device trust and security-based access control, and can help enforce fine-grained access control on your Google Cloud resources.

*See* Ex. 19 (annotated), Deploy Endpoint Verification To Use With Certificate-Based Access, p. 1 (available at https://cloud.google.com/beyondcorp-enterprise/docs/deploy-cba-endpoint-verification) (last accessed mid Jan. 2025 and incorporated by reference). Thus, CPE meets limitation B2 of Claim 19.

104.    Limitation C requires that "the valid digitally signed attestation of cleanliness includes at least one of an attestation that the trusted computing base has ascertained that the first host is not infested, and an attestation that the trusted computing base has ascertained the presence of a patch or a patch level associated with a software component on the first host." CEP checks the compliance of each endpoint device, i.e. Trusted Device, attempting to connect to protected resources housed in the Google Cloud by performing an endpoint control check that involves matching the endpoint's configuration parameters received from the endpoint device with specific device profile attributes, such as antimalware programs, applications, etc.:

Google announced a new feature and administration serverside API for the Chrome OS called Verified Access. This API will cryptographically validate the identity of any Chrome OS device that has connected to an enterprise's network. Additionally, it will allow the enterprise to verify that any connected devices conform to the company's security policies.

The new Google API uses digital certificates stored in the hardware-based Trusted Platform Modules (TPMs) that are found in every Chrome OS device. The TPM creates a way to ensure the correct security state of the devices has not been altered.

*See* Ex. 20 (annotated), New Google API Will Securely Verify Chrome Devices, p. 2 (available at https://securityintelligence.com/news/new-google-api-will-securely-verify-chrome-devices/) (last accessed mid Jan. 2025 and incorporated by reference).  As already explained and will be further

detailed below, Verified Access is a Google API that is used by numerous Google products to help keep data safe and secure and one of these is CEP.

105.    Exhibit 16 provides the following explanation of some CEP functions/features as compared to those offered by the less secure Google Cloud product:

### Chrome Enterprise Premium compared with Google Cloud

Chrome Enterprise Premium provides enterprise security features in addition to the basic protections, focused on protecting applications with authentication and authorization, that are baseline features of Google Cloud. Chrome Enterprise Premium extends those protections to applications and data running everywhere, with end-user protections and rich access policy protections.

The following table shows the differences between the baseline features available to Google Cloud customers and what is available with Chrome Enterprise Premium:

| Applications and Resources Access | GCP Baseline | BeyondCorp Enterprise Essentials | BeyondCorp Enterprise |
|---|---|---|---|
| Access control to web applications on Google Cloud Platform | ✓ | | ✓ |
| Access control to SSH, RDP and TCP ports for VMs on GCP | ✓ | | ✓ |
| Access control to Google Cloud Platform APIs | ✓ | | ✓ |
| Access control to Google Cloud console | ✓ | | ✓ |
| Access control to web applications on GCP internal load balancing | ✓ | | ✓ |
| Access control to web applications on customer premises | | | ✓ |
| Access control to thick client / client-server applications | | | ✓ |
| Access control to web applications on AWS and Azure | | | ✓ |
| Access control to SAML-based applications (login time) | | ✓ | ✓ |
| Access control to Google Workspace Admin Console | | ✓ | ✓ |
| Access Policies and Advanced Settings | GCP Baseline | BeyondCorp Enterprise Essentials | BeyondCorp Enterprise |

https://cloud.google.com/beyondcorp-enterprise/docs/overview. What this Google document relevantly conveys is that Google Cloud and CEP (formerly called BeyondCorp Enterprise) both provide Access control to Google Cloud Platform APIs (*see* yellow highlighted box above). K.Mizra's reliance on a Google Cloud document to explain how Access Control and Verified Access works in both CEP and Google Cloud, more generally, is not an allegation of infringement against Google Cloud, but rather an explanation of how CEP infringes Claim 19 by calling Google's Verified Access API and thus determining whether the "first host" is "clean" or "infested."

106.    More specifically, a Google produced document updated October 16, 2024 and found at https://developers.google.com/chrome/verified-access/overview and attached as Exhibit 21 shows how the Verified Access API is called by Chrome and thus also CEP:



CEP, operating in Google Cloud, calls Google's Verified Access API, also operating in the Google Cloud, determining whether the "first host" is "clean" or "infested." If it is the latter, the "first host" is not allowed to access secure resources also stored in the Google Cloud. These functions satisfy the requirements of limitation C of claim 19.

107.    Limitation D requires that "when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantining the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network." CEP meets these requirements by quarantining noncompliant, *i.e.*, unclean, endpoint

devices, i.e. Trusted Devices, attempting to connect to protected resources found in the Google Cloud:

> Using Context-Aware Access, admins can set up different access levels based on a user's identity and the context of the request (location, device security status, IP address). This can help provide granular access controls without the need for a VPN, and give users access to Google Workspace resources based on organizational policies. Insights and recommendations help admins improve the cybersecurity posture of their organization by proactively identifying areas that need attention, significantly reducing the need for admins to identify these risks themselves. For example, if we detect devices with outdated operating system versions  accessing corporate Workspace data, we can surface this as an Insight & pair it with a recommendation to block such devices from accessing Workspace data with a few clicks.

*See* Ex. 22, Context Aware Access Insights and Recommendations Are Now Generally Available, p. 3 (available at https://workspaceupdates.googleblog.com/2024/10/context-aware-access-insights-and-recommendations.html) (last accessed mid Jan. 2025 and incorporated by reference).

> Using context-aware access, you now have the option to automatically block access to Google Workspace data from compromised Android and iOS devices. A device may be counted as compromised if certain unusual events are detected, including devices that are jailbroken, bypassing of security controls, modification of restricted settings, and more.

*See* Ex. 23, Block Compromised Mobile Devices Using Context-Aware Access, p. 2 (available at https://workspaceupdates.googleblog.com/2024/05/block-compromised-mobile-devices-using-context-aware--access.html) (last accessed mid Jan. 2025 and incorporated by reference). Context-Aware Access is another Google product that is housed in the Googler Cloud that can be used by many other Google products.  One of those is CEP, which uses Context-Aware Access to

facilitate quarantining of first hosts," i.e. Trusted Devices. To put a finer point in it, the following Google produced content specifically shows that Context-Aware Access is a security feature of CEP:

### Chrome Enterprise Core

No cost

**Sign up for $0** ⤴

### Chrome Enterprise Premium

$6 per user monthly

Talk with an expert

| | Free | Premium |
|---|---|---|
| **Browser management and reporting** | | |
| Browser reporting | ✓ | ✓ |
| Cloud-based management | ✓ | ✓ |
| Extension security and management | ✓ | ✓ |

https://chromeenterprise.google/products/chrome-enterprise-premium/                4/11

5/5/25, 11:08 AM                    Enhance security with Chrome Enterprise Premium

chrome enterprise

| **Security** | Free | Premium |
|---|---|---|
| Safe browsing malware and phishing protections | ✓ (standard) | ✓ (real time) |
| Security insights | ✓ (reporting only) | ✓ (ability to take action) |
| Password protections | ✓ | ✓ (with reporting) |
| Malware deep scanning | ✗ | ✓ |
| Data loss prevention | ✗ | ✓ |
| Context-aware access for SaaS, Google Cloud, and private web apps via Chrome | ✗ | ✓ |
| URL filtering | ✗ | ✓ |
| Evidence locker | ✗ | ✓ |

CEP meets limitation D of Claim 19.

108.    Limitation E1 requires that "preventing the first host from sending data to one or more other hosts associated with the protected network includes . . . receiving a service request sent by the first host [and] serving a quarantine notification page to the first host when the service request comprises a web server request." CEP determines if an endpoint, i.e. Trusted Device, posture information stored in the TMP/TCB matches the profile designated for such a device.  If that endpoint information does not match, it is quarantined and restricted from accessing the protected network housed on the Google Cloud, preventing the Trusted Device from sending data to or receiving data from the Google Cloud housed protected resources until problems causing the Trusted Device to be blocked are remediated:

Using remediation messages and custom messages in Context-Aware Access, you can help users unblock themselves when a policy prevents them from accessing an app. These optional (but recommended) messages can help get users back to productivity and reduce support calls for admins.

For example, say that a user on a mobile device is using Gmail in the office successfully during the day, but is blocked when they try to access Gmail at home in the evening. When remediation messages are enabled, they will see guidance on how to address the reason they are blocked.

Remediation and custom messages are supported for access levels created in both Basic mode and Advanced mode. Also, they are supported for both Core Services and SAML apps.

*See* Ex. 24, Allow Users to Unblock Apps With Remediation Messages in Context Aware Access, p. 1 (available at https://support.google.com/a/answer/11560430?sjid=18176077754207218303-EU) (last accessed mid Jan. 2025 and incorporated by reference). A quarantine message is also delivered to the unclean endpoint device notifying its user of the quarantine.

## Use remediation messages and custom messages to help your users unblock themselves

When blocked, your users can encounter:

- **Default message**—Displays if you have not added remediation messages or custom messages. An example default message is: **Your organization's policy is blocking access to this app**.
- **Remediation messages**—Replaces the default message. <u>The messages are system generated, and correspond to the specific policy violation that blocked the user.</u> Remediation messages can present several remediation options to the user, which they can expand by clicking **Show more options**. In the case of several remediation options, the user needs to complete the steps for any one of the available options to unblock themselves.
- **Custom message**—Adds specific help for the user, such as additional advice on getting unblocked or a helpful link to click. You add custom messages as needed. A custom message can appear in conjunction with the default message, or with remediation messages.

*See id*. Accordingly, CEP meets limitation E1 of Claim 19.

109.    Limitation E2 requires that "preventing the first host from sending data to one or more other hosts associated with the protected network includes…in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host configured to provide data usable to remedy the insecure condition." CEP meets these requirements by providing to the Trusted Device a quarantine notification page containing links, or IP address(es), with resources (*i.e.* quarantine servers) configured to resolve the issue causing the quarantine. In other words, CEP provides remediation information to bring the Trusted Device into system security compliance so that it can access protected resources housed in the Google Cloud:

## Use remediation messages and custom messages to help your users unblock themselves

When blocked, your users can encounter:

- **Default message**—Displays if you have not added remediation messages or custom messages. An example default message is: **Your organization's policy is blocking access to this app**.
- **Remediation messages**—Replaces the default message. The messages are system generated, and correspond to the specific policy violation that blocked the user. Remediation messages can present several remediation options to the user, which they can expand by clicking **Show more options**. In the case of several remediation options, the user needs to complete the steps for any one of the available options to unblock themselves.
- **Custom message**—Adds specific help for the user, such as additional advice on getting unblocked or a helpful link to click. You add custom messages as needed. A custom message can appear in conjunction with the default message, or with remediation messages.

*See id.* Accordingly, CEP meets limitation E2 of Claim 19.

110.    Limitation F requires "permitting the first host to communicate with the remediation host." CEP meets these requirements by allowing a quarantined endpoint, i.e. Trusted Device, to access remediation resources to help make the device complaint with system safety requirements. *See id.*

111.    Google's acts of infringement have occurred within this District and elsewhere throughout the United States.

112.    As a result of Google's infringing conduct, K.Mizra has suffered damages. Google is liable to K.Mizra in an amount that adequately compensates K.Mizra for Google's infringement in an amount that is no less than a to-be-calculated fully paid-up, lump-sum, reasonable royalty, together with interest and costs as fixed by this Court under 25 U.S.C. § 284.

## VI.    SECOND CLAIM FOR RELIEF
### (Patent Infringement Under 35 U.S.C. § 271 of the '120 Patent)

113.    K.Mizra incorporates paragraphs 1 through 112 as though fully set forth herein.

114.    The '120 Patent includes 16 claims.

115.    Google has directly infringed one or more claims of the '120 Patent by making, importing, using, offering for sale, and/or selling the Accused Hyperparameter Tuning Instrumentalities, in violation of 35 U.S.C. § 271(a).

116.    Based on publicly available information, the Accused Hyperparameter Tuning Instrumentalities satisfy every limitation of at least Claim 1 of the '120 Patent.

117.    Claim 1 of the '120 Patent states:

[preamble] A method of determining hyperparameters of a classifier in a machine learning system by iteratively producing an estimate of a target hyperparameter vector, each iteration comprising the steps of:

[A] drawing a random sample of hyperparameter vectors from a set of possible hyperparameter vectors,

[B] updating the estimate of the target hyperparameter vector by using the random sample, and

[C]    Selecting, from the random sample of hyperparameter vectors, a hyperparameter vector producing a best result in the present and any previous iterations, and wherein the step of updating the estimate of the target hyperparameter vector uses said hyperparameter vector producing the best result.

Ex. 6 at 7:14–28.

118.    Regarding the preamble of Claim 1, and to the extent the preamble is determined to be limiting, the Asserted Hyperparameter Tuning Instrumentalities provide the features described in the preamble, which recites "A method of determining hyperparameters." For example, Google touts that its Vertex AI Platform is a "fully-managed, unified AI development platform for building and using generative AI."; "Custom training gives you complete control over the training process, including using your preferred ML framework, writing your own training code, and choosing hyperparameter tuning options."; and "Hyperparameter tuning jobs run multiple trials of your training application using different hyperparameter values."



**Vertex AI Platform**

# Innovate faster with enterprise-ready AI, enhanced by Gemini models

Vertex AI is a fully-managed, unified AI development platform for building and using generative AI. Access and utilize Vertex AI Studio, Agent Builder, and 160+ foundation models.

- <u>Custom training</u> gives you complete control over the training process, including using your preferred ML framework, writing your own training code, and choosing hyperparameter tuning options.

*See* Ex. 25, "Innovate faster with enterprise-ready AI, enhanced by Gemini models," (available at

https://cloud.google.com/vertex-ai?hl=en (accessed May 21, 2025) and incorporated by

reference).



**Hyperparameter optimization**

Hyperparameter tuning jobs run multiple trials of your training application using different hyperparameter values. You specify a range of values to test and Vertex AI discovers the optimal values for your model within that range.

*See* Ex. 26, "Vertex AI custom training overview," (available at https://cloud.google.com/vertex-ai/docs/training/overview (accessed May 21, 2025) and incorporated by reference). Accordingly, and to the extent the preamble of Claim 1 is deemed limiting, the Accused Hyperparameter Tuning Instrumentalities meet the limitation.

119.    The preamble also includes "of a classifier in a machine learning system".

> Vertex AI is a machine learning (ML) platform that lets you train and deploy ML models and AI applications. Vertex AI combines data engineering, data science, and ML engineering workflows, enabling team collaboration using a common toolset. Learn more.

*See* Ex. 27, "Vertex AI documentation," (available at https://cloud.google.com/vertex-ai/docs (accessed May 21, 2025) and incorporated by reference).



*See* screenshot above of page at https://www.youtube.com/watch?v=8hZ_cBwNOss (last accessed mid-May 2025) and incorporated by reference). Thus, and again only to the extent that this portion of the preamble of Claim 1 is deemed limiting, the Accused Hyperparameter Tuning Instrumentalities meet the limitation.

120.    The preamble further includes "by iteratively producing an estimate of a target hyperparameter vector":

*See* Ex. 28, "Overview of hyperparameter tuning," (available at https://cloud.google.com/vertex-ai/docs/training/hyperparameter-tuning-overview (accessed May 21, 2025) and incorporated by reference).



*See* screenshot above of page at https://www.youtube.com/watch?v=8hZ_cBwNOss (last accessed mid-May 2025) and incorporated by reference).  Accordingly, and to the extent this portion of the preamble of Claim 1 is deemed limiting, the Accused Hyperparameter Tuning Instrumentalities meet the limitation.

121.    The preamble further also includes "each iteration comprising the steps of:"



*Id.*  Again, then, to the extent this portion of the preamble of Claim 1 is deemed limiting, the Accused Hyperparameter Tuning Instrumentalities meet the limitation.

122.    Accordingly, the Accused Hyperparameter Tuning Instrumentalities meet limitation of the preamble of Claim 1.

123.    Limitations A and B of Claim 1 require:

[A] drawing a random sample of hyperparameter vectors from a set of possible hyperparameter vectors,

[B] updating the estimate of the target hyperparameter vector by using the random sample, and

Ex. 6 at 7:19–22.  Google has disclosed:



*See* Ex. 28.



*See* screenshot above of page at https://www.youtube.com/watch?v=8hZ_cBwNOss (last accessed mid-May, 2025) and incorporated by reference).

124.    Limitation A requires "drawing a random sample of hyperparameter vectors from a set of possible hyperparameter vectors" and the Google system meets this requirement:

```
StudySpec studySpec =
    StudySpec.newBuilder()
        .addMetrics(metric)
        .addParameters(parameter)
        .setAlgorithm(StudySpec.Algorithm.RANDOM_SEARCH)
        .build();
CustomJobSpec trialJobSpec =
    CustomJobSpec.newBuilder().addWorkerPoolSpecs(workerPoolSpec).build();
// hyperparameter_tuning_job
HyperparameterTuningJob hyperparameterTuningJob =
    HyperparameterTuningJob.newBuilder()
        .setDisplayName(displayName)
        .setMaxTrialCount(4)
        .setParallelTrialCount(2)
        .setStudySpec(studySpec)
        .setTrialJobSpec(trialJobSpec)
        .build();
```

.setMaxTrialCount refers to the number (maximum) of trials performed. Since the value is 4, it shows that 4 (or multiple) iterations are performed using "Random search".

Showing "RANDOM_SEARCH" being used as the search algorithm

*See* Ex. 29, "Create a hyperparameter tuning job for python package," (available at https://cloud.google.com/vertex-ai/docs/samples/aiplatform-create-hyperparameter-tuning-job-python-package-sample?hl=en (accessed May 21, 2025) and incorporated by reference).

125.    Accordingly, the Accused Hyperparameter Tuning Instrumentalities meet Limitation A of Claim 1.

126.    Limitation B requires "updating the estimate of the target hyperparameter vector by using the random sample". Google has stated:

> **Random search**: set up a grid of hyperparameter values and select *random* combinations to train the model and score. The number of search iterations is set based on time/resources.

> Random search is surprisingly efficient compared to grid search. Although grid search will find the optimal value of hyperparameters (assuming they are in your grid) eventually, random search will usually find a "close-enough" value in far fewer iterations. This great paper explains why this is so: grid search spends too much time evaluating unpromising regions of the hyperparameter search space because it has to evaluate every single combination in the grid. Random search in contrast, does a better job of exploring the search space and therefore can usually find a good combination of hyperparameters in far fewer iterations.

*See* Ex. 30, excerpts of "Intro to Model Tuning: Grid and Random Search," (available at https://www.kaggle.com/code/willkoehrsen/intro-to-model-tuning-grid-and-random-search (last accessed mid mid-May, 2025) and incorporated by reference).

> Randomized search is another method for hyperparameter optimization that can be more efficient than grid search in some cases. With randomized search, instead of specifying a list of values for each hyperparameter, you specify a distribution for each hyperparameter. The randomized search algorithm will then sample values for each hyperparameter from its corresponding distribution and train a model using the sampled values. This process is repeated a specified number of times, and the optimal values for the hyperparameters are chosen based on the performance of the models.

*See* Ex. 31, "Comparing Randomized Search and Grid Search for Hyperparameter Estimation in Scikit Learn," (available at https://www.geeksforgeeks.org/comparing-randomized-search-and-grid-search-for-hyperparameter-estimation-in-scikit-learn/ (accessed May 21, 2025) and incorporated by reference).

127.    Accordingly, the Accused Hyperparameter Tuning Instrumentalities also meet Limitation B of Claim 1.

128.    Limitation C requires "selecting, from the random sample of hyperparameter vectors, a hyperparameter vector producing a best result in the present and any previous iterations, and wherein the step of updating the estimate of the target hyperparameter vector uses said hyperparameter vector producing the best result."  Google describes:

How hyperparameter tuning works

Hyperparameter tuning works by running multiple *trials* of your training application with values for your chosen hyperparameters, set within limits you specify. Vertex AI keeps track of the results of each trial and makes adjustments for subsequent trials. When the job is finished, you can get a summary of all the trials along with the most effective configuration of values according to the criteria you specify.

*See* Ex. 28.

129.    Accordingly, the Accused Hyperparameter Tuning Instrumentalities meet Limitation C of Claim 1.

130.    Google's acts of infringement have occurred within this District and elsewhere throughout the United States.

131.    As a result of Google's infringing conduct, K.Mizra has suffered damages. Google is liable to K.Mizra in an amount that adequately compensates K.Mizra for Google's infringement in an amount that is no less than a to-be-calculated fully paid-up, lump-sum, reasonable royalty, together with interest and costs as fixed by this Court under 25 U.S.C. § 284.

## VII.    THIRD CLAIM FOR RELIEF
### (Patent Infringement Under 35 U.S.C. § 271 of the '717 Patent)

132.    K.Mizra incorporates paragraphs 1 through 131 as though fully set forth herein.

133.    The '717 Patent includes 20 claims.

134.    Google has directly infringed one or more claims of the '717 Patent by making, importing, using, offering for sale, and/or selling the Accused Mesh Networking Instrumentalities, in violation of 35 U.S.C. § 271(a).

135.    Based on publicly available information, the Accused Mesh Networking Instrumentalities satisfy every limitation of at least Claim 11 of the '717 Patent.

136.    Open Thread is an open-source implementation of the Thread networking protocol released by Google. A description of Open Thread is provided at www.openthread.io. On information and belief, openthread.io is owned and operated by Google.

137.    On information and belief, Open Thread is an implementation of the Thread networking technology used in Google Nest products.



OpenThread released by Google is an open-source implementation of Thread® (http://threadgroup.org). Google has released OpenThread to make the networking technology used in Google Nest products more broadly available to developers, in order to accelerate the development of products for the connected home and commercial buildings.

*See* Ex. 32, Homepage of openthread.io (available at https://openthread.io/ (accessed May 23, 2025) and incorporated by reference).

138.    Claim 11 of the '717 Patent states:

[preamble] A station for use in a wireless communication network, the station comprising:

[A] a transmitter arrangement, a receiver arrangement, and a processor circuit coupled to the transmitter arrangement and the receiver arrangement,

[B] the processor configured to start up in a not-associated state and to cause the transmitter arrangement to transmit association request messages in the not-associated state,

[C]  the processor circuit being configured to switch to an associated state upon reception at the receiver arrangement of an association grant in response to one of the association request messages,

[D] the processor circuit being configured to establish an associated route for communication with an association unit during subsequent communication of operating messages to an association unit,

[E] the associated route including a source of the association grant and, if the source of the association grant is not the association unit, the operating route between the source of the association grant and the association unit previously established for the source of the association grant in response to association request messages and/or association grants for intermediate stations,

[F] the processor circuit being configured to cause the transmitter arrangement to initiate and transmit association grants in response to association request messages, but only after switching to the associated state.

139.    Regarding the preamble of Claim 11, and to the extent the preamble is determined to be limiting, the Accused Mesh Networking Instrumentalities provide the features described in the preamble, which recites "A station for use in a wireless communication network." For example, Google devices including the Nest WiFi, the Nest Hub Max, and the Nest Hub (2nd Gen) are stations configured for use in a wireless network implementing the Thread networking protocol.



## A more reliable
## smart home network
## with Thread.

Thread is the latest technology for keeping all your smart home devices connected. Nest Hub Max and Nest Hub (2nd gen) have a built-in Thread border router to connect your Thread mesh network of smart devices to your Wi-Fi network. Your Thread-enabled network will be faster, use less energy, and reach more places throughout and around your home.

Ex. 33, "Nest Hub Smart Displays for your Home – Google Store," (available at

https://store.google.com/category/nest_hubs_displays (accessed May 12, 2025) and incorporated

by reference).

> Thread devices join users' existing home networks through a Thread Border Router. Just like a Wi-Fi router can bridge Wi-Fi and Ethernet devices into a single network, a Thread Border Router allows Thread devices to become part of users' networks.
>
> Google devices like the Nest WiFi, Google Nest Hub Max and Google Nest Hub (2nd gen) have Thread radios built-into them and act as Thread Border Routers.

Ex. 8.

140.    Similarly, the Nest Connect is a station configured for use in a Thread wireless

network.

> In an emailed statement, Grant Erickson, president of the Thread Group said, "Nest Detect relies on Thread's low power architecture to last for long periods of time on one battery. Nest Connect is a Thread router, which seamlessly extends both the reach and connectivity of the Thread network. Nest Guard provides seamless IP-based routing between Thread, Wi-Fi, and cellular, and their interoperability with the Yale Linus Lock is the posterchild of Thread's benefits in action."

Ex. 11.

141.    Accordingly, and to the extent the preamble of Claim 11 is deemed limiting, the Accused Mesh Networking Instrumentalities meet the limitation.

142.    Limitation A of Claim 11 of the Asserted Mesh Networking Patent requires a transmitter arrangement, a receiver arrangement, and a processor circuit coupled to the transmitter arrangement and the receiver arrangement.

143.    The Accused Mesh Networking Instrumentalities include a Thread radio with a transmitter arrangement and a receiver arrangement, as well as a processor circuit coupled to the transmitter arrangement and receiver arrangement that processes transmissions and receptions. For example, Google's documents confirm that each of the Nest WiFi, the Google Hub Max, and the Google Nest Hub (2nd Gen) include Thread radios.

> Thread has the following key benefits:
>
> - IPv6 based: Thread devices can join the same network as your other devices, and talk directly to each other and the cloud.

> Thread devices join users' existing home networks through a Thread Border Router. Just like a Wi-Fi router can bridge Wi-Fi and Ethernet devices into a single network, a Thread Border Router allows Thread devices to become part of users' networks.
>
> Google devices like the Nest WiFi, Google Nest Hub Max and Google Nest Hub (2nd gen) have Thread radios built-into them and act as Thread Border Routers.

Ex. 8. Similarly, a statement from the Thread Group (of which Google is a member) confirms that the Nest Connect is a Thread router.

> In an emailed statement, Grant Erickson, president of the Thread Group said, "Nest Detect relies on Thread's low power architecture to last for long periods of time on one battery. Nest Connect is a Thread router, which seamlessly extends both the reach and connectivity of the Thread network. Nest Guard provides seamless IP-based routing between Thread, Wi-Fi, and cellular, and their interoperability with the Yale Linus Lock is the posterchild of Thread's benefits in action."

Ex. 11. Indeed, in order to communicate with other devices, each Thread device (including the Accused Mesh Networking Instrumentalities) must necessarily include a transmitter arrangement

(to transmit messages from the Thread device to other devices in the Thread network) and a receiver arrangement (to receive communications, including responses to its transmitted messages, from other devices in the Thread network). Thread devices, including the Accused Mesh Networking Instrumentalities, must also include a processor coupled to both the transmitter arrangement and the receiver arrangement to, among other things, initiate transmissions, respond to messages sent by other devices in the Thread network, and process received messages. The operations of the processor are described in further detail in connection with Limitations B through F.

144.    Accordingly, the Accused Mesh Instrumentalities meet Limitation A of Claim 11.

145.    Limitation B of Claim 11 of the Asserted Mesh Networking Patent requires the processor is configured to start up in a not-associated state and to cause the transmitter arrangement to transmit association request messages in the not-associated state.

146.    The Accused Mesh Networking Instrumentalities include this feature. For example, Thread devices, such as the Accused Mesh Networking Devices, have a Detached state when the Thread device has not yet attached to a Thread network.

**Note:** The Detached state is observed when Thread is enabled but the device is not attached to a Thread network. The Disabled state is observed when Thread is disabled on the device.

Ex.    34,    "Developing    with    OpenThread    APIs,    (available    at https://openthread.io/codelabs/openthread-apis#1 (accessed May 23, 2025) and incorporated by reference).

147.    In order to attach to a Thread network, a Thread device such as the Accused Mesh Networking Instrumentalities goes through the Attach process.

Join an existing network

If the device elects to join an existing network, it configures its Channel, PAN ID, XPAN ID, and Network Name to match that of the target network via Thread Commissioning, then goes through the MLE Attach process to attach as a Child (End Device). This process is used for Child-Parent links.

Ex. 35, "Network Discovery and Formation," (available at https://openthread.io/guides/thread-primer/network-discovery (accessed May 20, 2025) and incorporated by reference). As the first step in this process, an attaching device sends a Parent Request message to find neighboring devices that are part of the Thread network.

1. Parent Request

A Parent Request is a multicast request from the attaching device that is used to discover neighboring Routers and Router Eligible End Devices (REEDs) in the target network.



*Id.* Upon receiving a response, the Thread device sends a message called the Child ID Request to a particular device in the Thread network for the purpose of establishing a link with that device to join the network.



**3. Child ID Request**

A Child ID Request is a unicast request from the attaching device (Child) that is sent to the Router or REED (Parent) for the purpose of establishing a Child-Parent link. If the request is sent to a REED, it upgrades itself to a Router (/guides/thread-primer/router-selection) before accepting the request.

*Id.* The attaching device may also be referred to as the Child, and the router with which the attaching device is seeking to establish a link may be referred to as the Parent.

148.    Accordingly, the Accused Mesh Networking Instrumentalities meet Limitation B of Claim 11.

149.    Limitation C of Claim 11 of the Asserted Mesh Networking Patent requires the processor circuit being configured to switch to an associated state upon reception at the receiver arrangement of an association grant in response to one of the association request messages.

150.    Thread devices, such as the Accused Mesh Networking Instrumentalities, become attached to a Thread network through the MLE Attach process. As described above in connection with Limitation B, the attaching device begins the process by sending a Parent Request and then exchanges further messages in order to establish a link with a device in the existing Thread network.

Join an existing network

If the device elects to join an existing network, it configures its Channel, PAN ID, XPAN ID, and Network Name to match that of the target network via Thread Commissioning, then goes through the MLE Attach process to attach as a Child (End Device). This process is used for Child-Parent links.

**Key Point**: Every device, router-capable or not, initially attaches to a Thread network as a Child (End Device).

1. The Child sends a multicast Parent Request (#1_parent_request) to all neighboring Routers and REEDs in the target network.
2. All neighboring Routers and REEDs (if the Parent Request Scan Mask includes REEDs) send Parent Responses (#2_parent_response) with information about themselves.
3. The Child chooses a Parent device and sends a Child ID Request (#3_child_id_request) to it.
4. The Parent sends a Child ID Response (#4_child_id_response) to confirm link establishment.

*Id.* When the link has been established, the Thread device has attached to the network and thus is in an Attached state. The establishment of the link between the attaching device and the Thread device in the existing Thread network is confirmed by the Child ID Response.

4. Child ID Response

A Child ID Response is a unicast response from the Parent that is sent to the Child to confirm that a Child-Parent link has been established.

*Id.* Notably, Thread devices such as the Accused Mesh Networking Instrumentalities may exchange information about how long they have been in certain states or roles, suggesting that these devices track their current state/role and when each state/role is entered.

| | |
|---|---|
| mChildRole (#structot_network_diag_mle_counters_1a33a2daf397cc144009b36dacdaa3c5de) | uint16_t Number of times device child role. |
| mChildTime (#structot_network_diag_mle_counters_1a01062bd8384fe1e360015373a45c68f1) | uint64_t Milliseconds device has child role. |
| mDetachedRole (#structot_network_diag_mle_counters_1a6d1b17ab4d3469693ff19fb596de7661) | uint16_t Number of times device detached role. |
| mDetachedTime (#structot_network_diag_mle_counters_1a75fde6d44ca4db581050d6a71a31bbee) | uint64_t Milliseconds device has detached role. |

Ex. 36, "otNetworkDiagMleCounters," (available at https://openthread.io/reference/struct/ot-network-diag-mle-counters (accessed May 23, 2025) and incorporated by reference).

151.    Accordingly, the Accused Mesh Networking Instrumentalities meet Limitation C of Claim 11.

152.    Limitation D of Claim 11 of the Accused Mesh Networking Instrumentalities requires the processor circuit being configured to establish an associated route for communication with an association unit during subsequent communication of operating messages to an association unit.

153.    Each of the Accused Mesh Networking Instrumentalities is configured to operate in a Thread network. A Thread network includes a device designated as the Leader.

> **Thread Leader**
>
> The Thread Leader is a Router that is responsible for managing the set of Routers in a Thread network. It is dynamically self-elected for fault tolerance, and aggregates and distributes network-wide configuration information.

Ex. 37, "Node Roles and Types," (available at https://openthread.io/guides/thread-primer/node-roles-and-types (accessed May 20, 2025) and incorporated by reference). The processors of the Accused Mesh Networking Devices are configured to store information about the route between the attaching device and the Leader as further discussed below in connection with Limitation E of Claim 11.

154.    Accordingly, the Accused Mesh Networking Instrumentalities meet Limitation D of Claim 11.

155.    Limitation E of Claim 11 requires the associated route includes a source of the association grant and, if the source of the association grant is not the association unit, the operating route between the source of the association grant and the association unit previously established

for the source of the association grant in response to association request messages and/or association grants for intermediate stations.

156.    Upon joining a Thread network, Thread devices such as the Accused Mesh Networking Devices receive a Child ID Response which provides information about the route between the Leader and the Thread device. For example, the Child ID Response includes the Source Address (i.e., the address for the Parent Thread device), the Leader RLOC (i.e., the address for the Leader of the Thread network), Network Data such as "more-specific routes," and Route information.

**Child ID Response Message Contents**

| | |
|---|---|
| Source Address | Parent's RLOC16 |
| Address16 | Child's RLOC16 |
| Leader Data | Information about the Parent's Leader (RLOC, Partition ID, Partition weight) |
| Network Data | Information about the Thread network (on-mesh prefixes, address autoconfiguration, more-specific routes) |
| Route (REED only) | Route propagation |
| Timeout | Inactivity duration before the Parent removes the Child |
| Address Registration (MEDs and SEDs only) | Confirm registered addresses |

Ex. 35. K.Mizra further expects that discovery, including review of source code, will provide further information and confirm this understanding.

157.    Accordingly, the Accused Mesh Networking Instrumentalities meet Limitation D of Claim 11.

158.    Limitation E of Claim 11 of the Asserted Mesh Networking Patent requires the processor circuit being configured to cause the transmitter arrangement to initiate and transmit association grants in response to association request messages, but only after switching to the associated state.

159.    Thread devices such as the Accused Mesh Networking Instrumentalities can send Parent Response and Child ID Response communications once attached to the Thread network, but will not send such responses if the device is disconnected from the network. For example, upon joining a Thread network, Router Eligible End Devices (or REEDs) can upgrade to become routers.

### Upgrade to a Router

After attaching to a Thread network, the Child device may elect to become a Router. Before initiating the MLE Link Request process, the Child sends an Address Solicit message to the Leader, asking for a Router ID. If the Leader accepts, it responds with a Router ID and the Child upgrades itself to a Router.

The MLE Link Request process is then used to establish bi-directional Router-Router links with neighboring Routers.

1. The new Router sends a multicast Link Request (#1_link_request) to neighboring Routers.

2. Routers respond with Link Accept and Request (#2_link_accept_and_request) messages.

3. The new Router responds to each Router with a unicast Link Accept (#3_link_accept) to establish the Router-Router link.

Ex. 38, "Router Selection," (available at https://openthread.io/guides/thread-primer/router-selection (accessed May 27, 2025 and incorporated by reference).



Ex. 37. Upon upgrading to a router, the Thread device is capable of accepting a request from an attaching device to join the Thread network.

**3. Child ID Request**

A Child ID Request is a unicast request from the attaching device (Child) that is sent to the Router or REED (Parent) for the purpose of establishing a Child-Parent link. If the request is sent to a REED, it underlines itself to a Router (/guides/thread-primer/router-selection) before accepting the request.

Ex. 35.

160.    Accordingly, the Accused Mesh Networking Instrumentalities meet limitation of the Limitation E of Claim 11.

161.    Google's acts of infringement have occurred within this District and elsewhere throughout the United States.

162.    As a result of Google's infringing conduct, K.Mizra has suffered damages. Google is liable to K.Mizra in an amount that adequately compensates K.Mizra for Google's infringement in an amount that is no less than a to-be-calculated fully paid-up, lump-sum, reasonable royalty, together with interest and costs as fixed by this Court under 25 U.S.C. § 284.

## VIII.    REQUEST FOR RELIEF

WHEREFORE, K.Mizra respectfully requests the Court find in its favor and against Google, and that the Court grant K.Mizra at least the following relief:

A.    Judgment that Google has infringed, literally and/or under the doctrine of equivalents, one or more claims of the Asserted Patents;

B.    Awarding damages to K.Mizra in an amount to be proven at trial and in the form of a fully paid-up, lump sum, reasonable royalty that considers and runs through expiration of all the Asserted Patents;

C.    Awarding enhanced damages, as appropriate, under 35 U.S.C. § 284;

D.    Awarding K.Mizra's costs (including internal and external costs and disbursements) and declaring this an exceptional case and awarding K.Mizra its attorneys' fees in accordance with 35 U.S.C. § 285;

E.      Pre-judgment and post-judgment interest at the maximum rate permitted by law on the damages caused by reason of Google's infringing activities and other conduct complained of herein; and

F.      Awarding such other and further relief as this Court deems just and proper under the circumstances.

## IX.      <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Fed. R. Civ. P. 38(b), K.Mizra hereby demands a trial by jury on all issues so triable.

Dated: _____                    Respectfully submitted,

                                           By: /s/ DRAFT_____
                                                Michael C. Smith
                                                Texas Bar No. 18650410
                                                michael.smith@solidcounsel.com
                                                Scheef & Stone, LLP
                                                113 E. Austin Street
                                                Marshall, TX 75670
                                                (903) 938-8900

                                                Robert R. Brunelli (admitted *pro hac vice*)
                                                CO State Bar No. 20070
                                                    rbrunelli@sheridanross.com
                                                Bart A. Starr (admitted *pro hac vice*)
                                                CO State Bar No. 50446
                                                    bstarr@sheridanross.com
                                                Brian S. Boerman (admitted *pro hac vice*)
                                                CO State Bar No. 50834
                                                    bboerman@sheridanross.com
                                                Gene Volchenko (admitted *pro hac vice*)
                                                IL State Bar No. 6342818
                                                    gvolchenko@sheridanross.com
                                                SHERIDAN ROSS P.C.
                                                1560 Broadway, Suite 1200
                                                Denver, CO 80202
                                                Telephone: 303-863-9700
                                                Facsimile: 303-863-0223
                                                litigation@sheridanross.com

*Of Counsel:*
Claire A. Henry
Texas Bar No. 24053063
Miller Fair Henry PLLC
1507 Bill Owens Parkway
Longview, TX 75604
Telephone: (903) 757-6400
Facsimile: (903) 757-2323
claire@millerfairhenry.com

*Attorneys for Plaintiff K.Mizra LLC*

72

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served on _____ upon all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

<div style="margin-left: 50%;">

<u>/s/ DRAFT   </u>
Lori R. Brown
lbrown@sheridanross.com
SHERIDAN ROSS P.C.
1560 Broadway, Suite 1200
Denver, CO 80202
Telephone: 303-863-9700
Facsimile: 303-863-0223

</div>